# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| **DARRELL COLLINS and DAVID INGLE,** | |
| *Plaintiffs*, | |
| **v.** | |
| **NAVICENT HEALTH, INC., d/b/a Navicent Health Medical Center and/or Navicent Health Baldwin, and QUENTIN JUDE, Chief of Police, Navicent Health Inc.,** | **CIVIL ACTION NO. 5:18-cv-00416-TES** |
| *Defendants*. | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This case concerns whether Defendants Navicent Health, Inc., and the Chief of Police for the Navicent Health Police Department, Quentin Jude, engaged in discriminatory employment actions when they did not promote the two white male plaintiffs. Like many discrimination cases, the parties have created and submitted an exceptionally dense record. Both sides have argued their case well and have submitted evidence that they believe supports their case. However, to jump straight to the lede, the Defendants, in this employment discrimination case, simply didn't improperly base their employment decisions on sex, age, or race. Accordingly, for the reasons discussed at length below, the Court **GRANTS** Defendants' Motion for Summary Judgment [Doc. 20].

## FACTUAL BACKGROUND

Plaintiffs Darrell Collins and David Ingle work for the Navicent Health Police Department, which is currently comprised of 16 dispatchers, a communications director, 35 police officers, two sergeants, two lieutenants, one captain, and one chief. [Doc. 29-1, ¶¶ 1, 3]. Generally, when an employee seeks a promotion within the Department's hierarchy, they are interviewed before a promotional board and, once an interview is completed, each member of the board provides his or her top three candidates for the position to the Department's chief—Defendant Quentin Jude. [*Id.* at ¶¶ 2, 7–8]. Even though the promotional board members rank applicants, Chief Jude makes the final promotional decision and is not bound by the board's recommendations. [*Id.* at ¶ 9].

Before getting too deep, let's lay out some of Defendants' employment actions as well as some important factors about our Plaintiffs and their proffered comparators. Demographically speaking, Darrell Collins, is a 47-year-old white male, and he began working for the Department in February 2000 as a police officer. [Doc. 39-2, ¶¶ 1, 20]. David Ingle is a 55-year-old white male, but he didn't become a police officer for the Department until November 2009. [*Id.* at ¶¶ 5, 21]. In June 2009 and May 2012, respectively, Defendants hired two more police officers—Dana Petit and Charles Richardson. [*Id.* at ¶¶ 24, 28]. Petit is a 35-year-old white female, and Richardson, an African-American male, is 50. [*Id.*].

On January 30, 2013, Collins applied for and received a promotion for a vacant sergeant position. [*Id.* at ¶¶ 36–37]. Eight months later, around September 2013, the Department announced another vacant sergeant position that (as both sides agree) required "four . . . years [of] law enforcement experience." *Compare* [*id.* at ¶ 38] *with* [Doc. 29-2, ¶ 38]. Ingle and Petit applied for this position, but Petit received it. [Doc. 39-2, ¶¶ 39, 43]. We'll call this the "Petit Sergeant Promotion." Fast forward to Spring 2017, when the Department announced a vacant lieutenant position that required a minimum of eight years of law enforcement experience with four years of supervisor experience. [*Id.* at ¶ 46]. Collins, Ingle, and Petit applied for this position; however, by June 30, 2017, Collins "knew that he had not been promoted." [Doc. 29-1, ¶ 32]; [Doc. 39-2, ¶¶ 47, 49]. Petit received this promotion too—which we'll call the "Petit Lieutenant Promotion." [Doc. 39-2, ¶ 49].

Later in 2017, the Department announced another vacant sergeant position for which Ingle and Richardson applied. [*Id.* at ¶¶ 58–59]. However, in September 2017, Richardson received that promotion, which, of course, we'll call the "Richardson Sergeant Promotion." [*Id.* at ¶ 60]. Then, "[o]nly months after" the Richardson Sergeant Promotion, the Department sought to fill another vacant lieutenant position. [*Id.* at ¶ 61]. Ingle, Richardson, and others applied, but, in November 2017, Richardson

3

"assumed" this promotional opportunity—the "Richardson Lieutenant Promotion."[1]
[*Id.* at ¶ 63].

These four promotions, for the most part, lay the general basis for Plaintiffs' claims, and, according to Plaintiffs, Defendants took certain, specific actions regarding these promotions that make their sex-, age-, and race-discrimination claims viable. Normally, it is the Court's practice to provide a detailed factual background before conducting its analysis. However, to detail the allegations of the specific actions and employment decisions and how they allegedly affected each promotion this early on could create unnecessary confusion. Therefore, purely for the sake of clarity, the Court delays introduction of these allegations since some of Plaintiffs' claims are time-barred and because many of these employment actions and decisions—although they arise from time-barred claims—are used to support timely claims. That said, in an effort to streamline the essence of Plaintiffs' claims, the Court will introduce these specific employment actions and decisions only when necessary—when laying the factual foundation for their timely-filed discrimination claims.

---

[1] Richardson was the only sergeant who applied for this particular lieutenant promotion. [Doc. 29-1, ¶ 82]. Ingle and the other applicants all held the rank of police officer at the time. [*Id.*].

<u>**DISCUSSION**</u>

**A.**    <u>**Legal Standard**</u>

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[2] "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323).

---

[2] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

Rather, "the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex Corp.*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Further, where a party fails to address another party's assertion of fact as required by Federal Rule of Civil Procedure 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge

on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted).

Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

###### B.     **Defendants' Motion for Summary Judgment**

In this case, Plaintiffs assert sex- and race- discrimination claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; race-discrimination and retaliation claims under 42 U.S.C. § 1981; age-discrimination claims under the Age Discrimination Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*; and two state-law claims, one for negligent hiring, supervision, and retention, and the other for intentional infliction of emotional distress. [Doc. 1, ¶ 1].

Because the moving parts of this case create a more tangled web than Charlotte's, the Court hopes that the following list will clarify the nature of Plaintiffs' discrimination

claims. First, Collins asserts sex- and age-based discrimination claims under Title VII and the ADEA for the Petit Lieutenant Promotion. Second, he asserts race-discrimination claims for the Richardson Lieutenant Promotion under Title VII and § 1981. Ingle, on the other hand, asserts sex- and age-based discrimination claims under Title VII and the ADEA for the Petit Sergeant Promotion and the Petit Lieutenant Promotion as well as race-discrimination claims under Title VII and § 1981 for the Richardson Sergeant Promotion and the Richardson Lieutenant Promotion. Defendants combat these discrimination claims under *McDonnell Douglas Corp. v. Green*'s burden-shifting framework, and the Court will, eventually, get to that analysis. 411 U.S. 792 (1973). But first, let's get rid of the time-barred discrimination claims.

1.    Plaintiffs' Sex- and Age-Discrimination Claims

Both Title VII and the ADEA clearly state that charges of discrimination "shall be filed" with the Equal Employment Opportunity Commission ("EEOC") within 180 days "after the alleged unlawful" employment "practice occurred." 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(1). To that, Defendants argue that Plaintiffs' discrimination claims asserted under Title VII and the ADEA regarding the Petit Sergeant Promotion and the Petit Lieutenant Promotion are time-barred. [Doc. 20-1, pp. 4–5, 9]. Plaintiffs, however, argue that their claims are timely because Defendants' employment actions are "inter-related" and constitute continuing violations "dating back to at least 2013." [Doc. 29, pp. 3–5].

"[A] 'continuing violation' is but a single violation that is continually or continuously manifested." *Morris v. Wallace Cmty. Coll.-Selma*, 125 F. Supp. 2d 1315, 1324 (S.D. Ala. 2001) (citing *Knight v. Columbus*, 19 F.3d 579, 582 (11th Cir. 1994)). "When a true continuing violation exists, a charge of discrimination is timely if the discrimination is last manifested within 180 days before the charge is filed." *Morris*, 125 F. Supp. 2d at 1324. The term has also been used to describe situations where a succession of similar but separate violations occur. *Id.*

The Eleventh Circuit Court of Appeals has recognized the Supreme Court's general principles that determine whether timely-filed acts in an EEOC charge can save non-timely acts. *Stewart v. Jones Util. and Contracting Co.*, 806 F. App'x 738, 741 (11th Cir. 2020) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112–14 (2002)). The Supreme Court has "held that 'discrete discriminatory acts are not actionable if [time-barred], even when they are related to acts alleged in [timely-filed] charges.'" *Stewart*, 806 F. App'x at 741 (quoting *Morgan*, 536 U.S. at 113). The Court explained that the continuing-violation doctrine does not apply to discrete acts such as an employer's failure to promote an employee because a lack of a promotion is "easy to identify" and "constitute[s] a separate actionable unlawful employment practice."[3] *Stewart*, 806 F.

---

[3] The Court pauses to note that "[a] true continuing violation may arise in the promotion context if an 'ongoing policy' results in a 'continuous refusal' to promote." *Morris v. Wallace Cmty. Coll.-Selma*, 125 F. Supp. 2d 1315, 1325 (11th Cir. 2001) (citing *Thigpen v. Bibb Cnty. Ga., Sheriff's Dep't*, 223 F.3d 1231, 1243 (11th Cir. 2000)). "However, when the underlying policy, although continuously in effect, manifests itself only episodically, as when vacancies come open, the policy does not 'continuously injure' the plaintiff and therefore does not support a true continuing violation theory." *Morris*, 125 F. Supp. 2d at 1325.

App'x at 741 (quoting *Morgan*, 536 U.S. at 114); *Cody v. Gold Kist, Inc.*, No. 1:03-CV-0745-RWS, 2007 WL 9700875, at *7 (N.D. Ga. June 29, 2007) (noting that a discrete act of discrimination such as a failure to promote "occurs on the day that it happens[]") (internal citation omitted); *see also Price v. M & H Valve Co.*, 177 F. App'x 1, 10 (11th Cir. 2006) (citing *Morgan*, 536 U.S. at 114) (recognizing that "the Supreme Court has explained that an employer's failure to promote is a discrete act or single occurrence[]"). Since a failure to promote is an identifiable violation, each discrete discriminatory act starts "a new clock for filing charges" pertaining to that act. *Stewart*, 806 F. App'x at 741 (quoting *Morgan*, 536 U.S. at 113). "A party, therefore, must file a charge within 180 days of the date of a discrete discriminatory or retaliatory act or lose the ability to recover for it." *Id.*

Thus, the circumstances surrounding both the Petit Sergeant Promotion and the Petit Lieutenant Promotion constitute allegations of separate unlawful employment practices, and Plaintiffs' EEOC charges are only timely "with respect to [promotions] that occurred within 180 days of the charge being filed but [are] untimely with respect to similar violations" falling outside that 180-day period. *Morris*, 125 F. Supp. 2d at 1324; *Morgan*, 536 U.S. at 105, 114 ("the statute precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period[]"). Albeit an unforgiving rule, determining whether Plaintiffs' discrimination claims under Title VII

and the ADEA can be salvaged as continuing violations will hinge on the exact dates of

the alleged discrete discriminatory acts—the dates Defendants promoted Petit.

> a.    *Ingle's Time-Barred Claims*

Obviously relying on the continuing-violation doctrine, Ingle filed his EEOC

charge on January 24, 2018, claiming that "discrimination took place" from "2013 [to]

December 2017." [Doc. 21-4, p. 3]. However, in order for his failure-to-promote claims

to be timely (because they are discrete acts), the alleged discriminatory promotions

must have occurred on or after July 28, 2017—180 days before Ingle filed his EEOC

charge.

With respect to Ingle's sex- and age-based discrimination claims arising from the

Petit Sergeant Promotion, Chief Jude announced that Petit "ha[d] been promoted to the

rank of [s]ergeant" on October 9, 2013, to be effective on October 13, 2013. [Doc. 29-4,

Ingle Aff., p. 59]. Thus, Ingle's discrimination claims under Title VII or the ADEA for

the Petit Sergeant Promotion are time-barred because that promotion occurred four

years before he filed his EEOC charge.

Similarly, Ingle's claims relating to the Petit Lieutenant Promotion arising under

Title VII or the ADEA are time-barred because the law required Ingle to file his EEOC

charge "within 180 days of the date of" this promotion. *Stewart*, 806 F. App'x at 741

(quoting *Morgan*, 536 U.S. at 113). On June 15, 2017, the Department announced, via

Interoffice Memo, that Petit would be taking on a "new role" as a lieutenant. [Doc. 40-6,

p. 6]. Therefore, Ingle had until December 13, 2017, to file an EEOC charge with respect to the Petit Lieutenant Promotion in order to recover under Title VII or the ADEA. But he waited until January 24, 2018, to file an EEOC charge that mentions this discrete promotional act. Because he missed the statutory deadline by 43 days, he cannot recover under either statute. *Morgan*, 536 U.S. at 105; [Doc. 40, Ingle Depo., p. 146:21–23].[4] The Court, therefore, **GRANTS** summary judgment to Defendants on Ingle's Title VII and ADEA claims arising out of the Petit Sergeant Promotion and the Petit Lieutenant Promotion.

*b.*   <u>*Collins' Time-Barred Claim*</u>

As for Collins' Title VII and ADEA claims relating to the Petit Lieutenant Promotion, the record clearly shows that the Department announced Petit's "new role" as a lieutenant via memo on June 15, 2017. [Doc. 40-6, p. 6]. Therefore, like Ingle, given the easily-identifiable nature of employment promotions, Collins had until December 13, 2017, to file an EEOC charge to recover for sex- and age-based discrimination claims under Title VII or the ADEA for the Petit Lieutenant Promotion. He filed his EEOC charge on January 25, 2018—44 days too late. *Stewart*, 806 F. App'x at 741 (quoting *Morgan*, 536 U.S. at 114); [Doc. 21-3, p. 3].

---

[4] When citing to a deposition, the Court uses the Document Number assigned by CM/ECF with its corresponding page number—not the page number listed on the pre-filed deposition. As a result, the deposition pages cited in this Order will be off by one number when reviewing the pertinent deposition filed on the docket.

Hoping to save his claims via an equitable-tolling argument, Collins argues that "by June 30, 2017, [he] knew that he had not been promoted." [Doc. 29-1, ¶ 32]; [Doc. 29, pp. 3–4]. By making such an argument, he takes the obvious position that his "clock for filing [a] charge[]" began to tick when he "knew or reasonably should have known that [he] was discriminated against." *Carter v. W. Pub. Co.*, 225 F.3d 1258, 1265 (11th Cir. 2000); *Stewart*, 806 F. App'x at 741 (quoting *Morgan*, 536 U.S. at 113). Although not explicitly stated, the crux of Collins' equitable-tolling argument can best be summarized as this: knowing that "he had not been promoted" is not the same as knowing that Petit had been promoted instead of him. [Doc. 29-1, ¶ 32]. To accept Collins' argument would mean that his clock would start ticking on some unknown and undisclosed date— whatever date he learned that Petit received the lieutenant position over him. In other words, Collins argues that he had to know that *Petit*, specifically, received the promotion instead of him to start the clock on his sex- and age-discrimination.

His own testimony, however, completely invalidates his equitable-tolling argument. During his deposition, Collins clearly states that he "would have found out earlier than" June 15, 2017—the date the Department announced the Petit Lieutenant Promotion—that she had been promoted instead of him. [Doc. 42, Collins Depo., p. 171:6–22]; [Doc. 40-6, p. 6]. "In order for equitable tolling to be justified," "the facts must show that, in the period more than 180 days prior to filing [a charge] with the EEOC, [Collins] had no reason to believe that [he was a] victim[] of unlawful discrimination."

13

*Ross v. Buckeye Cellulose Corp.*, 980 F.3d 648, 660 (11th Cir. 1993). That simply isn't the case here. Since Collins admits that he "would have found out" before the Department posted its June 15, 2017 memo announcing Petit's promotion to lieutenant, it would have been apparent to him (at least sometime before June 15, 2017) that he might have a failure-to-promote claim based on sex- and age- discrimination, and equitable tolling will not act to remedy his failure to adhere to the statutory timing requirements. [Doc. 42, Collins Depo., p. 171:6–22]; [Doc. 40-6, p. 6]; [Doc. 29, pp. 4–5].

To give Collins the benefit of doubt, however, let's take his later date of June 30, 2017.[5] [Doc. 29-1, ¶ 32]. Start the clock. Using June 30, 2017, Collins had until December 27, 2017, to file his EEOC charge. Thus, even starting from the date that helps Collins the most, he still missed the deadline for any claim regarding the Petit Lieutenant Promotion. *Stewart*, 806 F. App'x at 741 (quoting *Morgan*, 536 U.S. at 113); *Carter*, 225 F.3d at 1265; [Doc. 21-3, p. 3]. He should have acted as soon as he found out that Petit had been promoted over him, and while we do not know that precise date, we do know—from his own testimony—that it was "earlier than" June 15, 2017. [Doc. 42, Collins Depo., p. 171:6–22]. And because he failed to file an EEOC charge within the statutory period after he "knew or reasonably should have known that [he] was

---

[5] True, this date (according to one part of his testimony) only operates as the date by which Collins knew he had not been promoted. [Doc. 29-1, ¶ 32]. However, elsewhere in his testimony, he clearly stated that he "would have found out earlier than" June 15, 2017, that Petit had been promoted instead of him. [Doc. 42, Collins Depo., p. 171:18–22]. Acknowledging this obvious contradiction, the Court will assume that Collins first believed that Defendants discriminated against him on June 30, 2017.

discriminated against," the Court must **GRANT** summary judgment to Defendants on

Collins' Title VII and ADEA claims arising out of the Petit Lieutenant Promotion.[6]

*Stewart*, 806 F. App'x at 741 (quoting *Morgan*, 536 U.S. at 113); *Carter*, 225 F.3d at 1265.

### 2.    Plaintiffs' Race-Discrimination Claims

Now that we have separated the procedural chaff, we are left with Plaintiffs'

Title VII and § 1981 claims arising out of the Richardson Sergeant Promotion and the

Richardson Lieutenant Promotion.[7] Of course, as mentioned above, Plaintiffs'

remaining claims relating to these two promotions are solely race-based—Richardson is

African American, and Plaintiffs are white. [Doc. 39-2, ¶¶ 1, 5, 28]; [Doc. 29-1, ¶ 16].

Even though the Title VII and ADEA claims from the Petit Lieutenant Promotion are

time-barred, the Court must nonetheless discuss certain allegations concerning the Petit

Lieutenant Promotion because they serve as the bases for Collins' claims regarding the

Richardson Lieutenant Promotion. That said, the issues presented in Ingle's race-

discrimination claims are undeniably much more clear-cut. Thus, with deference to

consideration for clarity and concision, the Court will first address Ingle's remaining

---

[6] In Count II of their Complaint, Plaintiffs assert claims for race discrimination under 42 U.S.C. § 1981. [Doc. 1, p. 22]. However, as both Collins and Ingle admit, race-discrimination claims cannot be brought against Defendants with respect to any promotion that involved Petit because she, Collins, and Ingle are white. [Doc. 42, Collins Depo., pp. 155:10—156:9]; [Doc. 40, Ingle Depo., p. 135:6–16]; [Doc. 39-2, ¶¶ 1, 5, 24]; *cf.* [Doc. 29-1, ¶ 16]. Therefore, to the extent Plaintiffs still assert such claims, the Court **GRANTS** summary judgment to Defendants.

[7] The Court addresses Plaintiffs' state-law claims after ruling on their discrimination claims.

claims before turning its attention to Collins' race-discrimination claim arising from the Richardson Lieutenant Promotion.

a.      *Ingle's Race-Discrimination Claims*

Without a doubt, Title VII and § 1981 prohibit workplace discrimination on the basis of race. "The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices that have been used to disadvantage" employees based on their race. *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) ("*Lewis I*") (en banc) (quoting *McDonnell Douglas*, 411 U.S. at 800). In order to survive summary judgment, Ingle must present sufficient facts to permit a jury to rule in his favor. *Lewis I*, 918 F.3d at 1220. "One way that [he] can do so is by satisfying the burden-shifting framework set out in *McDonnell Douglas*." *Id.* In addition to the *McDonnell Douglas* route, Ingle can also argue, as he does, that the evidence in this case "demonstrate[s] a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination." *Id.* at 1220 n.6 (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).

Proceeding initially under *McDonnell Douglas*, Ingle must show that he belongs to a protected class; that he was subjected to an adverse employment action (in this case, a failure to be promoted); that he was qualified to perform the job in question; and

that his employer[8] "treated 'similarly situated' employees outside" of his class more

favorably. *Lewis I*, 918 F.3d at 1220–21. If Ingle can show these four things, he has

established a prima facie case of discrimination, and "the burden shifts to . . .

[D]efendant[s] to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at

1221. Should Defendants carry this burden, Ingle "must then demonstrate that the . . .

proffered reason was merely a pretext for unlawful discrimination, an obligation that

'merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that []he has

been the victim of intentional discrimination.'" *Id.* (quoting *Tex. Dep't of Cmty. Affairs v.*

*Burdine*, 450 U.S. 248, 256 (1981)). Defendants, of course, use the *McDonnell Douglas'*

burden-shifting framework to support summary judgment whereas Plaintiffs argue that

its application precludes it. [Doc. 20-1, pp. 11–13]; [Doc. 29, pp. 6–13].

It goes without saying that Ingle's race-based Title VII and § 1981 claims

originate from Defendants' failure to promote him, and since the underlying facts for

both claims are the same, "[t]he same analysis—and in particular, the *McDonnell*

*Douglas* burden-shifting framework" will apply to both. *Lewis I*, 918 F.3d at 1220 n.5

---

[8] Here, the specific term of "employer" (as opposed to the usual, broader term of "Defendants") is used because Title VII claims can only be brought against a plaintiff's employer. *See Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) ("Individual capacity suits under Title VII are . . . inappropriate. The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act."). In other words, Chief Jude cannot be held individually liable under Title VII. However, because § 1981 claims—which do permit suits against individuals—and Title VII are analyzed under the same analytical framework, the Court will continue to make all-encompassing references to "Defendants" with the caveat that only Navicent Health could be subject to liability under Title VII.

(citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)). To put a finer point on it, in the failure-to-promote context, Ingle will have to show (1) membership in a protected class, (2) that he was qualified and applied for the promotion, (3) that he was rejected despite his qualifications, and (4) that other equally or less qualified employees who were not members of the protected class were promoted. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004) *abrogated on other grounds by Lewis I*, 918 F.3d at 1218; *McDonnell Douglas*, 411 U.S. at 802. With a more narrowed focus on prong four, however, the "equally or less qualified employee[]"—the comparator—who received the promotion must be "similarly situated" to Ingle "in all material respects" to round out Ingle's prima facie case. *Wilson*, 376 F.3d at 1089; *Lewis I*, 918 F.3d at 1224.

### i.     *The Richardson Sergeant Promotion*

At bottom, the essence of Ingle's claims (with respect to the Richardson Sergeant Promotion) depends on race, and Defendants don't argue that Ingle, who is white, can't seek protection under federal anti-discrimination laws. Thus, what the Court must determine is whether Ingle has shown that he was qualified for the promotion, rejected (despite those qualifications), and that someone of a different race who was similarly situated in all material respects *to him* got the promotion.

To quickly recap, Ingle began working as a police officer with the Department in November 2009, about two-and-a-half years before Richardson. [Doc. 39-2, ¶¶ 21, 28].

Then, in September 2017, the Department announced a vacant sergeant position—the

Richardson Sergeant Promotion—which "required four . . . years of law enforcement

experience." [*Id.* at ¶ 58]; [Doc. 29-4, Ingle Aff., ¶ 24]; *see* [Doc. 22, Jones Decl., ¶ 5] *in*

*connection with* [Doc. 22-7, p. 3].

　　　Defendants attack Ingle's claims relating to the Richardson Sergeant Promotion

on grounds that Ingle was not qualified for that promotion. [Doc. 20-1, pp. 11–12].

Specifically, they argue that Ingle and Richardson are not similarity situated using *Lewis*

*I*'s "all material respects" standard due to differences in their work histories. [*Id.*]; [Doc.

29, pp. 9–10]. This standard is, of course, "worked out on a case-by-case basis, in the

context of individual circumstances." *Lewis I*, 918 F.3d at 1227. It is not an exacting

standard that requires Ingle and Richardson to be "identical save for their race." *Id.*

Instead, a similarly situated comparator, as the parties correctly summarize, will

"[o]rdinarily" have engaged in the same basic conduct, been subject to the same

employment policies, will have shared the same supervisor, and will have similar

employment histories. [Doc. 20-1, p. 5 (citing *Lewis I*, 918 F.3d at 1227–28)]; [Doc. 29, p. 9

(citing same)].

　　　Neither side readily disputes that Ingle and Richardson, as law enforcement

officers, are "governed by the Georgia Peace Officer Standards and Training Council";

ultimately supervised by Chief Jude; and that within the Department, both are subject

to Navicent Health's policies and procedures. *See, e.g.*, [Doc. 29, p. 10]; [Doc. 39-2, ¶ 72].

On the topic of Ingle's work history, however, Defendants contend that it is an undisputed fact that "Ingle was written up for falling asleep on duty[]" and that he "admitted to falling asleep on duty while carrying a firearm." [Doc. 20-2, ¶¶ 65–66]; [Doc. 40, Ingle Depo., p. 72:13–15]. Ingle, of course, argues that this fact is not as undisputed as Defendants let on. *See* [Doc. 29-1, ¶¶ 65–66]. Ingle was given the opportunity to account for his actions and acknowledged that he "read" and "under[stood]" why he was receiving a written warning. [Doc. 22-2, pp. 2–4]. To some extent, Ingle is correct—Defendants' employment records do not indicate that he fell asleep on duty. Rather, they indicate that he "appeared to be sleeping" but "raised [his] head several seconds after [his supervisor] arrived." [*Id.* at p. 2]. In explaining why he had his head down, Ingle simply stated that he "was trying to fight off a sore throat and headache" and that he "should have [went] home but . . . didn't want to use the time." [*Id.* at p. 4]. And while he didn't "remember dozing off," he stated that he was "extremely embarrassed for the concern [his actions] caused." [*Id.*].

Whether Ingle fell asleep or didn't, however, is largely irrelevant because he unquestionably "understand[s]" that firearm-carrying police officers "have a responsibility to be 'fit for duty'" and that his actions "could have jeopardized [his] own personal safety or the safety of others." [*Id.* at p. 2]; [Doc. 40, Ingle Depo., p. 72:16–17 (confirming that Ingle always carries a firearm at work)]. To that, Ingle and Defendants (as evidenced by the relevant signatures on Ingle's written warning) both

acknowledged that Ingle's actions violated two of Navicent Health's Rules of Conduct.
[Doc. 22-2, pp. 2–3]. The first was a violation under Group One—violation of safe
practices dangerous to life of self or others, and the other was a violation under Group
Two—loafing or neglecting work.[9] [*Id.* at p. 2]; [Doc. 22-5, pp. 8–9]. For these violations,
Defendants placed Ingle on probation for one year, and even though the evidence does
not reflect (as Defendants misstate) that Ingle "[fell] asleep on duty"—his actions,
nevertheless, were violations and are a part of a disciplinary record.[10] [Doc. 20-2, ¶¶ 65–
66]; [Doc. 22-2, pp. 2–4].

In a further attempt to demonstrate Ingle's lack of qualification for the
Richardson Sergeant Promotion, Defendants argue that he demonstrates a lack of effort
with respect to his position. [Doc. 20-1, p. 11]. Specifically, they contend that he "was
persistently slow in responding to calls." [*Id.* (citing [Doc. 20-2, ¶¶ 63–64])]. Yes, Ingle's
evaluation[11] clearly states that he "was spoken to about time management when

---

[9] "Violations" under Group One "are serious in nature and will, except in unusual circumstances, result
in immediate discharge. Under no circumstances will an employee with a Group One violation receive
less than a written warning with a probationary period of 12 months unless otherwise noted." [Doc. 22-5,
p. 8]; [Doc. 29-1, ¶ 68]. "Violations" under Group Two "are less serious in nature" and "will result in at
least an oral warning and, depending on the circumstances, a written warning, or discharge." [Doc. 22-5,
p. 8].

[10] Notably, in fact, Navicent Health's Rules of Conduct specifically list "[s]leeping while on duty" as a
Group One violation and had Ingle met that criteria, Defendants would have undoubtedly written him
up for that specific violation, but they didn't. [Doc. 22-5, p. 8].

[11] This evaluation is a review of Ingle's "Core and Contributing Values" and "Overall Performance" for
the period between October 2014 and September 2015. *See* [Doc. 22-2, pp. 5–9]. On March 12, 2016, Ingle
indicated that he reviewed and "agree[d] with" this evaluation. [*Id.* at pp. 7–8].

responding to certain calls" and that he "[n]eeds [i]mprovement" when it comes to demonstrating passion for his work and to the Department. [Doc. 22-2, p. 5]. However, when it comes to integrity, caring, respect towards others, learning in his work environment, and teamwork to accomplish tasks and meet performance goals, Ingle's evaluation reflects that he "[c]onsistently demonstrates" and "[m]eets" those values. [*Id.*]. "Overall," Defendants, from October 2014 through September 2015, regarded Ingle as a "Valued Contributor." [*Id.* at p. 7].

Compare this evaluation to the one conducted a year later. [*Id.* at pp. 10–13]. Within a year, Ingle went from "[n]eeds [i]mprovement" to "[c]onsistently [d]emonstrat[ing]" passion for his work and to the Department. *Compare* [*id.* at p. 5] *with* [*id.* at p. 10]. In this second evaluation, from October 2015 through September 2016, Defendants saw Ingle as an employee who "knows his job and how to effectively complete tasks at hand," and, based on this, they considered him a "Strong Contributor."[12] [*Id.* at pp. 11–12].

Defendants, on the other hand, at least within the relevant, comparable period between 2014 through 2016, never indicated that Richardson "[n]eed[ed] [i]mprovment." [Doc. 22-4, pp. 9–17]. In fact, in both of his evaluations, Richardson received an "[o]verall" "Top Talent" rating whereas Ingle only received ratings

---

[12] As with the other evaluation, Ingle was "given the opportunity to read and ask questions," and, on March 10, 2017, he indicated that he "agree[d] with" what the evaluation stated. [Doc. 22-2, pp. 12–13].

attributable to "Valued" and "Strong Contributor[s]" in the Department. [*Id.* at pp. 11, 16]; [Doc. 22-2, pp. 7, 12]. Most notably though, Richardson, unlike Ingle, "has never been subject to a disciplinary action by [the Department]." [Doc. 20-2, p. 5]. Thus, based on the differences between their employment histories, and ostensibly, Richardson's lack of misconduct, *see Lewis I*, 918 F.3d at 1227, Defendants clearly take the nondiscriminatory position that Ingle was simply not as qualified for the Richardson Sergeant Promotion.

By now, it is well known that the burden-shifting scheme presented by *McDonnell Douglas* first requires a plaintiff to establish a prima facie case, which means he must, among other things, show that he was qualified to perform the job in question. *Lewis I*, 918 F.3d at 1220–21. If he makes his case, then the burden falls to the defendant-employer "to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 1221. Here, looking at the specifications for the sergeant position, one could easily conclude that, for the most part, Ingle met them. *See, e.g.*, [Doc. 22-7, pp. 2–3]. Even though he had just come off probation at the time he applied for the Richardson Sergeant Promotion, Ingle had been with the Department for at least four years as a police officer, had well above a high school diploma, and held a certification from the Peace Officer Standards and Training ("POST") Council and a valid Georgia driver's license. [Doc. 39-2, ¶¶ 6, 10, 21, 58]; [Doc. 20-4, Ingle Aff., p. 17]; [Doc. 29-2, ¶ 9 (showing that Ingle obtained a bachelor's degree in "Political Science and Public

Administration" in 1990)]. Generally speaking, Ingle may have very well been qualified on paper.

This case, however, is quite the anomaly because it presents an uncommon analysis. The fourth portion of Ingle's prima facie case—that Defendants, despite his qualifications, treated similarly situated employees outside of his protected class more favorably—and Defendants' burden of articulating a nondiscriminatory reason are one and the same. *Lewis I*, 918 F.3d at 1220–21. To pierce Ingle's prima facie case, Defendants point to his disciplinary record and several of his evaluations to pull Richardson from the comparator label using *Lewis I*'s "all material respects" standard.[13] Meaning, because Ingle has a disciplinary record and Richardson does not, Defendants argue that the two are not similarly situated in all material respects when it comes to their qualifications for the Richardson Sergeant Promotion. At the same time, it is Ingle's disciplinary record and his evaluations that Defendants proffer as their legitimate, nondiscriminatory reason for promoting Richardson instead of Ingle. Thus, given the uncommon intersection between Ingle's prima facie case and Defendants' legitimate, nondiscriminatory reason, it can be assumed that the initial and secondary burdens of the *McDonnell Douglas* burden-shifting framework are satisfied. No matter how you

---

[13] Defendants also point to the fact that the promotional board "provided lower scores to Ingle as compared with Richardson" as a nondiscriminatory reason for not giving him a promotion. [Doc. 20-1, p. 12]. However, for reasons that will become clear later in this Order, the Court discusses this proffered reason in connection with the Richardson Lieutenant Promotion. *See* nn.15–16, *infra*.

spin it, Ingle's race-discrimination claim (under *McDonnell Douglas*, at least) hinges on Ingle's ability to—at the "tertiary pretext stage"—demonstrate that Defendants' proffered reasons (his disciplinary record and his evaluations) were "merely a pretext for unlawful discrimination" "intended to mask its true reason" for not promoting him to sergeant in 2017. *Id.* at 1221–23; *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (en banc). Put succinctly, pretext "means a lie . . . [or] a phony reason for some action." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1261 (11th Cir. 2001) (citing *Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996)).

The Eleventh Circuit Court of Appeals has repeatedly emphasized that as long as the proffered nondiscriminatory reason is "one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it[.]" *Gogel*, 967 F.3d at 1136 (citations omitted). And when an employee attacks the veracity of the proffered reason, the inquiry is limited to whether the employer gave an honest explanation for its behavior. *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1310–11 (11th Cir. 2012). "Thus, to establish pretext at the summary judgment stage, [Ingle] must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendants'] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Gogel*, 967 F.3d at 1136 (quoting *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1273, 1289 (11th Cir. 2005)); *see also* [Doc. 29, p. 11]. A reason is not pretext for discrimination, however, "unless it is shown *both* that the

reason was false[] *and* that discrimination was the real reason." *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (quoting *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006)). And finally, it must be remembered that Ingle "must show not merely that [Defendants'] employment decision[] [was] mistaken" but that their decision to promote Richardson instead of him was "in fact *motivated by race*." *Springer*, 509 F.3d at 1349 (citing *Alexander v. Fulton Cnty.*, 207 F.3d 1303, 1339 (11th Cir. 2000)) (emphasis added).

Ingle has not shown "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendants' stated reasons—his disciplinary record and his evaluations—"sufficient to provide a legitimate ground for a reasonable factfinder to find [those reasons] unworthy of credence." *Gogel*, 967 F.3d at 1136–37. In short, he has failed to provide evidence showing that *but for his race*, Defendants would have promoted him to sergeant in 2017. Let's review what the record evidence shows.

Ingle aptly points out that "[w]hile meeting expectations, Defendants have rated [him] as a 'valued contributor' and 'strong contributor'" who "knows his job and how to effectively complete tasks at hand." [Doc. 39-2, ¶¶ 79–80]; [Doc. 22-2, p. 11]; [Doc 29, p. 13]. In a third evaluation covering Ingle's employment between October 2016 to September 2017, Defendants—again rating Ingle as a "strong contributor"—praised him for his willingness to train new officers coming into the Department but also criticized

his apparent inability to stay in his assigned areas.[14] [Doc. 29-4, Ingle Aff., pp. 115–16].

Certainly, most of these reviews, as well as his supervisory experience before working

for the Department, shine a positive light on Ingle as a police officer. [Doc. 29, p. 13];

[Doc. 39-2, ¶¶ 6–8, 11, 13]. However, in a promotional context, "a plaintiff cannot prove

pretext by simply arguing or even by showing that he was better qualified than the

officer who received the position he coveted." *Brooks*, 446 F.3d at 1163 (quoting

*Alexander*, 207 F.3d at 1339). In fact, a plaintiff is not allowed to "recast an employer's

proffered nondiscriminatory reasons or substitute [his] business judgment for that of

the employer." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010)

(quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)). Interestingly,

however (given some of his pretext arguments regarding the Richardson Lieutenant

Promotion), he appears to do just that.

For the Richardson Sergeant Promotion, Ingle points out that Defendants

promoted Richardson to sergeant despite the fact that four of the six members of the

promotional board did not rank Richardson as their top choice for the position. [Doc.

29-2, ¶ 60]; [Doc. 29-3, Collins Aff., pp. 94–105]. Yes, only two members of the

promotional board ranked Richardson as their top choice; however, as stark as the

---

[14] True, this third evaluation was not completed until early 2018, well after the Richardson Sergeant Promotion and the Richardson Lieutenant Promotion; however, it is relevant to show how Defendants viewed Ingle's performance as an employee during that time period. *See* [Doc. 29-4, Ingle Aff., pp. 114–16].

reality may be, no one on the board ranked Ingle within their top three candidates.[15]

[Doc. 29-3, Collins Aff., pp. 94–105]. Ingle admits that the promotional board "is merely

advisory,"[16] and "Defendants do not dispute that Chief Jude makes the final

promotional decision." [Doc. 39-2, ¶ 34]. And, according to Chief Jude, "each

promotional decision that [he has] made to date has been in line with the [promotional]

board's recommendation." [Doc. 23, Jude Decl., ¶ 12]. And looking at the evidence

relating to the Richardson Sergeant Promotion, this is true.

---

[15] What's interesting about Ingle's argument here is that he uses the promotional board's rankings to *support* his failure-to-promote claim for the Richardson Sergeant Promotion. [Doc. 29-2, ¶ 60]. He proposes that Defendants should not have promoted Richardson to sergeant because four of the six members of the promotional board did not rank Richardson as "their choice for the position." [*Id.*]. Point being, according to Ingle, Chief Jude ignored the promotional board's rankings and handpicked Richardson for the sergeant position simply because he is African American.

[16] "Merely advisory" how? Again, a hefty portion of Ingle's argument to *support* his claims arising out of the Richardson Sergeant Promotion rests on the fact that Chief Jude promoted someone (Richardson) who was not the promotional board's "choice for the position." *See* n.13, *supra*; [Doc. 29-2, ¶ 60 (noting that four out of six members of the promotional board "did not rank . . . Richardson as "their choice for the position")]. Such an argument indicates that the members of promotional board list their "best candidate" *for* the position. [*Id.* (noting Ingle's argument that the other two members of the promotional board "ranked . . . Richardson as the best candidate")]. Yet elsewhere, Ingle contends that the promotional board's rankings "were based on *how well the candidates performed in the interview*—not the candidate's overall *qualification for* promotion." [Doc. 29-1, ¶ 78] (emphasis added). Ingle's arguments conflict with each other, and they can't both be true. However, the slightest peak at the substance of the promotional board's recommendations indisputably shows that all but one of the board's members, co-plaintiff Collins included, hinted at or gave opinions on their "[t]op three candidates *for promotion*." *See, e.g.*, [Doc. 29-3, Collins Aff., p. 98] (emphasis added). For example, Petit goes so far as to separate her "[t]op [t]hree [p]icks" from her "interview rating[]" scores. [*Id.* at pp. 100–01]. Another officer, Captain Jesse Crowder, gave opinions like "[this candidate] would be a great addition to the leadership team" and that "[another candidate's] leadership experience . . . would be beneficial to the [D]epartment." [*Id.* at p. 96]. And finally, yes, Collins' recommendations did, truthfully speaking, substantively discuss a candidate's interview, but he still threw in qualification-based opinions to support his rankings. [*Id.* at p. 102]. Clearly, the promotional board supplies more than interview performance ratings, their recommendations were aimed at a candidate's qualifications. *See* [Doc. 39-2, ¶ 32].

Richardson received two first-pick rankings, three second-pick rankings, and one third-pick ranking. [Doc. 29-3, Collins Aff., pp. 94–105]. Although no member ranked Ingle in their top three, he would have Defendants and, by extension, the Court disregard his disciplinary record and his evaluations and accept his business judgment (over Chief Jude's) that he was, in reality, the more-qualified candidate. Defendants have shown the legitimate, nondiscriminatory reasons they relied upon when reaching the decision to promote Richardson instead of Ingle, and Ingle has failed to show that they did not rely on those reasons for their action. All things considered, the record establishes that Defendants were undoubtedly concerned with Ingle's shortcomings, and he simply does not meet his burden of establishing that a reasonable jury could find that but for his race, he would have received the Richardson Sergeant Promotion. *Gogel*, 967 F.3d at 1138; *cf. Pinder v. J. Marshall L. Sch.*, 11 F. Supp. 3d 1208, 1219–20 (N.D. Ga. 2014). Thus, after applying the *McDonnell Douglas* burden-shifting framework to the Richardson Sergeant Promotion, Ingle cannot survive summary judgment.

ii.     *The Richardson Lieutenant Promotion*

Because Ingle did not mention any particulars regarding the Richardson Lieutenant Promotion in his EEOC charge, Defendants contend Title VII bars this claim for his failure to exhaust administrative remedies. [Doc. 20-1, p. 10]; [Doc. 21-4, p. 3]. So, before turning to the merits of Ingle's race-based discrimination claims regarding the

Richardson Lieutenant Promotion, the Court must first address Defendants'
exhaustion-related concerns.

> A.    *Ingle's Race-Discrimination Claim Under Title VII*

Defendants promoted Richardson to the rank of sergeant in September 2017, and
three months later, they promoted him to the rank of lieutenant. [Doc. 39-2, ¶ 60]; [Doc.
40, Ingle Depo., p. 160:9–11]. More than a month before Ingle filed his EEOC charge,
Chief Jude posted the announcement notifying the Department that Richardson had
"been promoted to Nightshift Lieutenant." [Doc. 29-3, Collins Aff., p. 117]; [Doc. 21-4, p.
3]. Needless to say, Ingle could have included information relating to the Richardson
Lieutenant Promotion in his EEOC charge, but he didn't.

"As litigants and the courts immerse themselves in the intricacies of [an] EEOC
exhaustion analysis, we sometimes overlook the reason Congress required claimants to
first present their grievances to the EEOC." *Chesnut v. CC Servs., Inc.*, No. 5:18-CV-404
(MTT), 2020 WL 1433876, at *4 (M.D. Ga. Mar. 24, 2020). So, let's start with that—
Congress' rationale for exhaustion.

Exhaustion serves one primary purpose: to allow the EEOC to "have the first
opportunity to investigate the alleged discriminatory practices [so that it can] perform
its role in obtaining voluntary compliance and promoting conciliation efforts." *Id.* (first
quoting *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 929 (11th Cir. 1983) and then
citing *Wu v. Thomas*, 863 F.2d 1543, 1548 (11th Cir. 1989) ("The purpose of the filing

requirement is to [e]nsure that the settlement of grievances be first attempted through the office of the EEOC.")). "With this purpose in mind," the Eleventh Circuit Court of Appeals "has noted that judicial claims are allowed if they amplify, clarify, or more clearly focus the allegations in the EEOC [charge], but [it] has cautioned that allegations of new acts of discrimination [lodged in a judicial complaint] are inappropriate." *Batson v. Salvation Army*, 897 F.3d 1320, 1327 (11th Cir. 2018) (quoting *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004)). "At the same time, though," the Eleventh Circuit Court of Appeals has been "extremely reluctant to allow procedural technicalities to bar" a Title VII claim. *Id.* Therefore, a "plaintiff's judicial complaint [will be] limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory*, 355 F.3d at 1280.

Guided by the analyses in *Gregory* and *Batson*, the inquiry before the Court is relatively straightforward: whether the Richardson Lieutenant Promotion "was like or related to, or grew out of, the allegations contained in [Ingle's] EEOC charge." *Id.* at 1280; 897 F.3d at 1328. To resolve this issue, the *Gregory* court looked to the "ultimate act" complained of by the employee. 355 F.3d at 1280. Here, Ingle's ultimate act is that he was not promoted. *See id.* ("The ultimate act . . . complained about was . . . terminat[ion]."). However, Ingle presents two discrete acts: one ultimate act arises out of the Richardson Sergeant Promotion and the other from the Richardson Lieutenant Promotion. *Stewart*, 806 F. App'x at 741, *supra*. The substance of Ingle's EEOC charge

includes specific information about the Richardson Sergeant Promotion, but it contains

nothing about the Richardson Lieutenant Promotion. *See* [Doc. 21-4, p. 3]. However, as

explained below, this isn't a *Gregory-* or *Batson*-like situation where a claim can extend

from one ultimate act of disparate treatment. 355 F.3d at 1280 (holding that the EEOC's

investigation of race- and sex-discrimination complaints that led to the plaintiff's

termination "would have uncovered any evidence of retaliation"); 897 F.3d at 1328

(noting that a failure-to-accommodate claim under the Americans with Disabilities Act

is "inextricably linked" to a retaliation claim brought under the same act). Simply put,

the Richardson Lieutenant Promotion is not "related to" nor did it "grow out of" the

Richardson Sergeant Promotion—it's a separate claim. *Gregory*, 355 F.3d at 1280. Thus,

as a discrete employment action, the Richardson Lieutenant Promotion is considered to

be a "new" claim. *Id.* at 1279–80; *see also Stewart*, 806 F. App'x at 741. Ultimately, the

Richardson Lieutenant Promotion is not like a retaliation claim that constitutes an

extension from an "ultimate act" of discrimination. The two promotions are two

separate acts of alleged race discrimination, and Ingle needed to include both in his

EEOC charge.

A retaliation claim can be inextricably linked to underlying discrimination claims

even if they're not specifically mentioned, but that is not the issue here. Fully aware of

the separate and discrete claim involving the Richardson Lieutenant Promotion, Ingle is

now "inappropriate[ly]" attempting to bring this completely "new" and separate act in

his Complaint on the basis that it is inseparably "linked" with the Ricardson Sergeant Promotion. *Gregory*, 955 F.3d at 1279–80; *Batson*, 897 F.3d at 1328. If (even though he didn't check the "Retaliation" box on his EEOC charge) Ingle was trying to save a Title VII retaliation claim involving the Richardson Sergeant Promotion, *Gregory* and *Batson* would—obviously—require the Court to reach a different outcome since an employer's alleged retaliatory act would be "inextricably linked" to an underlying "ultimate act" of discrimination.[17] *Batson*, 897 F.3d at 1328 (discussing an instance where "termination, mentioned in the [c]harge was the specific form of retaliation took"); [Doc. 21-4, p. 3]. But he's not trying to save a retaliation claim—he's hoping that the "ultimate act" of a second denied promotion (the Richardson Lieutenant Promotion) will survive because it was "separated by only months" from an earlier one (the Richardson Sergeant Promotion) and "included the same parties and improper promotions within the Department." [Doc. 29, p. 6]. However, the Eleventh Circuit Court of Appeals has

---

[17] The Court notes that Ingle did assert a retaliation claim, but as discussed below, he only asserts it "in violation of [§] 1981," not Title VII. [Doc. 1, p. 26].

already addressed this issue in *Haugabrook v. Cason*.[18] 518 F. App'x 803, 809 (11th Cir. 2013). Where an employer fails to select an employee for separate positions, those are "separate instances of alleged discrimination." *Id.*

Likewise, Ingle's race-discrimination claim alleges two ultimate acts. It is a bit of a stretch to say that an EEOC investigator would have "at least in some fashion" discovered this completely "new" ultimate act that Ingle never penned to paper in his charge. *Gregory*, 355 F.3d at 1279–80; *Batson*, 897 F.3d at 1328; [Doc. 21-4, p. 3]. Yes, a retaliation claim under Title VII (if alleged) could "grow out of" an ultimate act, but, in this case, the "new act[] of discrimination" can't. *Batson*, 897 F.3d at 1327 (quoting *Gregory*, 355 F.3d at 1279). Ingle easily could have included his claims concerning the Richardson Lieutenant Promotion in his EEOC charge or he could have filed it as a stand-alone and completely separate charge. Yet, he didn't. To say that Ingle

---

[18] In *Haugabrook*, the plaintiff argued that her employer's (Valdosta County Schools) discrimination in not selecting her for a curriculum-oriented director position "grew out of the same type of discrimination" she experienced when she was not selected for two other positions—an assistant superintendent position and another director position geared towards teaching and learning. 518 F. App'x 803, 809 (11th Cir. 2013). Importantly, there was "[n]othing in Haugabrook's EEOC charge" to put her employer or the EEOC on notice of her claim for the curriculum-oriented director position because it did not exist nor had it been filled at the time she filed her charge. *Id.* Thus, "[i]t follow[ed] that the scope of the EEOC's investigation could not reasonably be expected to have included possible discrimination in selecting" the recipient of the curriculum-oriented director position. *Id.* While noticeably different, factually, what *Haugabrook* offers, legally, doesn't change the outcome here. Even though Defendants had already filled the Richardson Lieutenant Promotion position *before* Ingle filed his EEOC charge, there was nothing included in the charge that could have led the EEOC investigator to uncover this alleged act of discrimination. Moreover, Ingle never argues that during "[his] communications with the EEOC investigator" that he "g[a]ve details" relating to the Richardson Lieutenant Promotion. *Cf. Rodriguez v. Sec'y of Dep't of Veterans Affairs*, 605 F. App'x 957, 958 (11th Cir. 2015) (per curiam). The "scope of the EEOC's investigation could not reasonably be expected to have included possible discrimination" for the Richardson Lieutenant Promotion even though the position had already been filled because Ingle's EEOC charge was silent as to that discrete employment action. *Haugabrook*, 518 F. App'x at 809.

administratively exhausted his Title VII claim with respect to the Richardson Lieutenant

Promotion would run afoul of the Congressional purpose for the exhaustion

requirement: that the EEOC have the "first opportunity to investigate and mediate *all*

employment discrimination claims[.]" *Rodriguez v. Sec'y of Dep't of Veterans Affairs*, 605 F.

App'x 957, 958 (11th Cir. 2015) (per curiam) (emphasis added). By failing to include

anything about the Richardson Lieutenant Promotion, Ingle stripped the EEOC of that

opportunity. Consequently, Ingle did not administratively exhaust his Title VII race-

discrimination claim arising from the Richardson Lieutenant Promotion, and as such, it

is administratively barred. Thus, the Court **GRANTS** summary judgment to

Defendants on this claim.

### B.    *Ingle's Race-Discrimination Claim Under § 1981*

Nevertheless, as Ingle correctly points out, he "asserted race-based claims

pursuant to [§] 1981[,]" which means his race-discrimination claim arising out the

Richardson Lieutenant Promotion still undergoes a *McDonnell Douglas* analysis. [Doc.

29, p. 5 (citing [Doc. 1, ¶¶ 1, 85–93])]. So, even if Ingle's Title VII claim for the

Richardson Lieutenant Promotion could "reasonably be expected to grow out of" his

EEOC charge under *Gregory* and its progeny, it makes no difference—analytically

speaking—because discrimination claims under both statutes are subject to the same

framework. 355 F.3d at 1280; *Lewis I*, 918 F.3d at 1220 n.5. Having already ironed out

what Ingle must demonstrate for a race-based failure-to-promote claim, let's jump

directly to the parties' arguments. *See* Section (B)(2)(a), *supra*.

When it comes to the Richardson Lieutenant Promotion, Defendants—save for

one argument—rest upon the same points made in their defense to the Richardson

Sergeant Promotion to show that Ingle and Richardson are not similarly situated in all

material respects. [Doc. 20-1, pp. 5, 11–12]. Aside from their differences in disciplinary

history and evaluations, Defendants, relying on *Miller-Goodwin v. City of Panama City*

*Beach*, now contend that Ingle and Richardson are not similarity situated since the

Richardson Lieutenant Promotion involves Ingle trying to "jump rank" from police

officer to lieutenant. 385 F. App'x 966, 971 (11th Cir. 2010); *Lewis I*, 918 F.3d at 1224;

[Doc. 20-1, p. 12]. According to Defendants, Ingle, as a police officer, "cannot show that

he was 'similarly situated' to . . . Richardson" because Richardson, a sergeant, "out-

ranked" him. [Doc. 20-1, p. 12].

While a "difference in rank" may thwart a plaintiff's prima facie case in the end,

such a difference is not as definitive as Defendants argue. *Miller-Goodwin*, 385 F. App'x

at 971. Yes, in *Miller-Goodwin*, the Eleventh Circuit Court of Appeals ruled that "[b]ased

on the difference in rank," a female *corporal* was not similarly situated to a male *sergeant*.

*Id.* However, that ruling resulted from an application of a bygone standard: the "too

strict" nearly-identical test. *See id.* (citing *Wilson*, 376 F.3d at 1091) (explaining that the

"comparator must be similarly situated in all relevant respects" and "nearly identical to

36

the plaintiff"); *Lewis I*, 918 F.3d at 1224. As such, the comparator-based analysis with

regard to Ingle and Richardson must be more cautiously approached—adhering to

*Lewis I*'s "all material respects" standard. 918 F.3d at 1224. The standard that—in the

Eleventh Circuit—

> best and most fairly implements federal statutory prohibitions on
> "discrimination," properly balances the need to protect employees from
> invidious discrimination with the deference owed to employers' rational
> business judgments, and sensibly serves considerations of sound judicial
> administration by making summary judgment available in appropriate (but
> by no means all) cases.

*Id.* at 1224–25.

A proper analysis shouldn't focus only on the difference in rank but in the

qualification for the position. The Richardson Lieutenant Promotion occurred "[o]nly

months after" the Richardson Sergeant Promotion, and according to Chief Jude, "[t]he

same candidates who applied" for the Richardson Sergeant Promotion applied for the

Richardson Lieutenant Promotion.[19] [Doc. 23, Jude Decl., ¶ 23]. Moreover, given that the

two promotions were only three months apart, there was nothing else for Defendants to

consider when deciding who received the Richardson Lieutenant Promotion. [Doc. 40,

Ingle Depo., p. 160:9–11]. This follows because Ingle's third evaluation—the one

conducted for the period between October 2016 and September 2017—wasn't

---

[19] Chief Jude even admits that, "in part," he promoted Richardson over Ingle because Richardson "was
the only [s]ergeant to apply," and Ingle, on the other hand, testified that he has never "known anybody"
to "jump rank" in the Department. [Doc. 23, Jude Decl., ¶ 23]; [Doc. 40, Ingle Depo., pp. 161:8—162:23].
However, in light of *Lewis I*'s "all material respects" standard, the Court is hesitant to base its ruling on
such a strict distinction. *Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019) ("*Lewis I*").

completed until March 26, 2018, a little over three months *after* Defendants promoted Richardson to lieutenant. [Doc. 29-4, Ingle Aff., pp. 114–16]; [Doc. 29-3, Collins Aff., p. 117]. And while Defendants couldn't consider the now-completed evaluation as it stands in the record (because it didn't exist at the time of the Richardson Lieutenant Promotion), they could have undoubtedly considered Ingle's conduct and/or performance during the covered period to make the promotional decision. *See* n.14, *supra*; *see also* [Doc. 29-4, Ingle Aff., p. 116 (likewise denoting Ingle's agreement with this third evaluation after he had "been given the opportunity to read and ask questions concerning [it]")]. In other words, the evaluation completed in March 2018 memorializes Ingle's performance between October 2016 through September 2017. So, easily enough, the same legitimate, nondiscriminatory reasons discussed above have to apply to the Richardson Lieutenant Promotion as well. *See* Discussion, Section (B)(2)(a)(i), *supra*. Thus, notwithstanding Ingle's qualifications, the nondiscriminatory reasons articulated by Defendants for the Richardson Sergeant Promotion carry through to rebut Ingle's prima facie case for the Richardson Lieutenant Promotion—landing us once again at pretext. *Lewis I*, 918 F.3d at 1221.

Despite the unchanged analysis for the first and second stages of the *McDonnell Douglas* burden-shifting framework between the Richardson Sergeant Promotion and the Richardson Lieutenant Promotion, addressing the arguments that Defendants' nondiscriminatory reasons for the Richardson Lieutenant Promotion are pretextual is

necessary. Although Ingle, in the end, likewise fails to meet his burden for pretext for the Richardson Lieutenant Promotion, his arguments warrant some discussion because of the interesting variance from his pretext arguments for the Richardson Sergeant Promotion.

First, a lieutenant position within the Department requires supervisory experience, and whether Ingle had more supervisory experience than Richardson or Richardson had more than Ingle is irrelevant to the Court's ruling.[20] [Doc. 29-4, p. 81]; [Doc. 20-1, pp. 12–13]; [Doc. 29, p. 13]. In addition to Ingle's performance issues put forth as Defendants' nondiscriminatory reason for promoting Richardson to lieutenant instead of Ingle, they also contend that the promotional "board provided lower scores to Ingle as compared with Richardson . . . ." [Doc. 20-1, pp. 12–13]. Ingle combats this argument with the simple, but true, assertion that the "scores are immaterial." [Doc. 29, p. 13]; [Doc. 29-1, ¶ 9 ("Chief Jude was not required to make promotions based upon the recommendations of the [promotional] board.")].

Let's recall Ingle's pretext-related arguments for the Richardson Sergeant Promotion above. *See* n.15, *supra*. When he didn't receive that promotion, he argued that Chief Jude chose Richardson only because he was black and that Chief Jude should not

---

[20] The record contains many documents that the parties agreed should be sealed to protect Plaintiffs', Petit's, and Richardson's identity and privacy. [Doc. 31]; [Doc. 32]. These documents detail their previous work experience in a supervisory capacity, and the parties use them to make their arguments for and against the claims asserted in this case. Although it reviewed the documents in ruling on Defendants' summary judgment motion, the Court does not cite to them because they are sealed and because the outcome of this case is not dependent on any argument dealing with supervisory experience.

have promoted Richardson to sergeant since four out of six members of the promotional board did not rank him as their top choice. *See, e.g.*, [Doc. 29-3, Collins Aff., pp. 94–104]; [Doc. 29-2, ¶ 60]. When trying to demonstrate pretext for his race-discrimination claim for the Richardson Sergeant Promotion, Ingle wanted everyone to believe that Chief Jude discriminately ignored the promotional board's recommendations. Now, for the Richardson Lieutenant Promotion, he executes a perfect about-face and argues that the promotional board's scores "are immaterial." [Doc. 29, p. 13].

At the end of the day, it's apparent that Ingle just disagrees with Defendants' promotional decisions because, like most unsuccessful applicants, he thinks he should have gotten the job because of how long he has worked with the Department. *See* [Doc. 29, p. 14 (basing argument on "years of diligent performance")]. But the law is clear: an employee's belief that an employment decision was wrong simply doesn't matter. *See Springer*, 509 F.3d at 1349, *supra*. All that the law is concerned with is whether an employer made an employment decision based on a discriminatory motive. *Id.* And as long as an employer articulates a nondiscriminatory reason for its decision, that reason will carry the day unless the employee can "show that a reasonable jury could find that but for" a protected characteristic the employer would have decided differently. *Gogel*, 967 F.3d at 1135. Here, Ingle hasn't met that burden. The record evidence doesn't show that a reasonable jury could find that Defendants' proffered reasons—Ingle's shortcomings throughout his years with the Department—were not the true reasons

they didn't promote him. Thus, contrary to his arguments, application of *McDonnell Douglas* does not preclude summary judgment with respect to Ingle's race-discrimination claims arising out of the Richardson Lieutenant Promotion.

C.    *A Convincing Mosaic of Circumstantial Evidence*

However, the *McDonnell Douglas* framework "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("*Lewis II*"). Presentation of a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination "will always" preclude summary judgment in these types of cases. *Id.* (citation omitted). And Ingle can present a "convincing mosaic" if he can put forth evidence that demonstrates "suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn"; "systematically better treatment of similarly situated employees"; and "that the employer's justification [was] pretextual." *Id.* (citation omitted).

To construct his mosaic, Ingle makes three main arguments. [Doc. 29, pp. 13–15]. First, Ingle contends that "[d]espite years of diligent performance, Defendants have consistently promoted less-experienced and less-qualified officers based upon [sex], race, and age." [*Id.* at p. 14]. However, that is all he says. He doesn't provide a single record citation to support this statement. As a result, the Court has no idea who these

41

other "officers" are. Is he referring to Petit's promotions? Richardson's? Or to other unnamed individuals within the Department? The only mention of other "recent" promotions are placed in the record by Defendants and, other than the obvious promotions for Petit and Richardson, Ingle never argues that the other promotions came about through some kind of illegal discriminatory practices.[21] *See* [Doc. 20-2, ¶ 10]. Thus, whatever Ingle attempted to argue though this statement, his argument is woefully undeveloped, and it fails.

Ingle's second tile placed into his convincing mosaic is that "Chief Jude promotes against the recommendation[s] of the [promotional b]oard." [Doc. 29, p. 14]. But, as can be assumed from the discussions above, this tile breaks pretty easily. Ingle cannot show a convincing mosaic of discrimination by arguing that Chief Jude promotes whoever he wants—according to Ingle, based on race, age, and sex—despite the recommendations of the board because by his own unequivocal admission, the board's recommendations "are immaterial." [Doc. 29, p. 13]; [Doc. 39-2, ¶ 34 (describing the promotional board as "merely advisory")]. He can't subtly claim that the

---

[21] It is not the Court's burden to comb through extensive records, like this one, to develop arguments in a party's favor when such arguments should have been presented to the Court for consideration. "The onus is upon the parties to formulate arguments." *A.L. v. Jackson Cnty. Sch. Bd.*, 635 F. App'x 774, 787 (11th Cir. 2015) (quoting *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)). The Eleventh Circuit Court of Appeals has repeatedly stated that, "[t]o prevail on a particular theory of liability, a party must present that argument to the district court. Our adversarial system requires it; district courts cannot concoct or resurrect arguments neither made nor advanced by the parties." *Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011) (citation omitted). It is not the district court's job, "especially in a counseled civil case, to create arguments for someone who has not made them or to assemble them from assorted hints and references scattered throughout the [record]." *Reaves v. Sec'y, Fla. Dep't of Corr.*, 872 F.3d 1137, 1149 (11th Cir. 2017) (citation omitted).

promotional board's recommendations are somehow material and that Chief Jude

should have followed the board's recommendations for the Richardson Sergeant

Promotion and then attack one of Defendants' nondiscriminatory reasons for not

promoting him on the basis that the board's recommendations are immaterial. *See* [Doc.

20-1, p. 12 (discussing the promotional board's scores between Ingle, Richardson, and

Petit)] *in connection with* [Doc. 29, p. 13] *and* [Doc. 29-2, ¶ 60].

Third, Ingle argues that Defendants contradicted the Department's policy with

respect to the requirements for the lieutenant position and the interview process. [Doc.

29, p. 15]. Here, Ingle points out that the Richardson Lieutenant Promotion "was not

announced" and that no one was interviewed for this promotion.[22] [Doc. 29-2, ¶¶ 62–

63]. Of course, Defendants disagree, stating that "[a]s with all other positions, the

position was posted on [the Department's] intranet portal." [Doc. 39-2, ¶ 62]; [Doc. 29-2,

¶ 62].[23] Undoubtedly, Ingle makes this argument to say that Defendants failed to follow

announcement protocol with respect to the Richardson Lieutenant Promotion so that

they could promote Richardson instead of him. [Doc. 29, pp. 13–15]. However, Chief

---

[22] "Historically, the promotional process begins with a position being posted on [the Department's] intranet portal where applications are subsequently submitted electronically as positions become available." [Doc. 23, Jude Decl., ¶ 7].

[23] The record evidence Ingle cites however, isn't about the Richardson Lieutenant Promotion, it's about the Petit Lieutenant Promotion. *See, e.g.*, [Doc. 39-2, ¶ 62–63 (citing [Doc. 20, Ingle Depo, p. 147:9–19])]. With respect to Ingle's arguments that Defendants didn't announce the Richardson Lieutenant Promotion, his vague references to "the 2017 [l]iuetenant position" engender confusion. [*Id.*]. However, with a full understanding of the timeline of this case, it is clear that Ingle could only be referring to the Richardson Lieutenant Promotion because he undoubtedly went through the interview process for the Petit Lieutenant Promotion. [Doc. 40, Ingle Depo., p. 167:1–9].

Jude considered the same applicant pool for both the Richardson Sergeant Promotion and the Richardson Lieutenant Promotion. [Doc. 23, Jude Decl., ¶ 23]. Thus, even if Defendants didn't announce the Richardson Lieutenant Promotion such a failure is immaterial because Ingle was still considered for the position, and his argument that Defendants "contradiction" of its own announcement policy supports a convincing mosaic of circumstantial evidence fails.

Ingle similarly takes issue with Defendants' relaxation of the requirements for the Richardson Lieutenant Promotion. Ingle admits that the Department's policies do not "say an officer can jump rank." [Doc. 40, Ingle Depo., p. 161:17]. But, according to him, the policies "absolutely impl[y] that" possibility. [*Id.* at p. 161:13–14]. By Ingle's argument, if applicants—be they "a private or a sergeant"—meet the requirements for lieutenant they can "jump rank." [*Id.* at p. 161:17–21]. Succinctly put—by Ingle's interpretation of the Department's policy—qualifications matter, not rank. [Doc. 40, Ingle Depo., pp. 161:8—162:19 (discussing Ingle's interpretation of the requirements for the lieutenant position)].

Correctly, Ingle points out that the lieutenant rank requires a "[m]inimum of eight years of employment as a police officer with four years of experience as a supervisor." [Doc. 29-4, p. 81]; *see also* [Doc. 29-2, ¶ 64]. Presumably, in an attempt to show "systematically better treatment of similarly situated employees" to construct his convincing mosaic, Ingle argues that "Defendants changed the minimum

requirements." *Lewis II*, 934 F.3d at 1185; [Doc. 29-2, ¶ 64]. According to Ingle's

deposition testimony, when "the announcement was made"[24] for the Richardson

Lieutenant Promotion, Defendants "changed [the requirements] for [Richardson] to get

promoted"—the announcement "said only 12 months law enforcement experience . . .

that was it." [Doc. 40, Ingle Depo, pp. 94:6—95:6]. Notwithstanding the Department's

"standing" policies for the lieutenant position's requirements, Ingle says that

Defendants have "been changing [them] . . . as they see fit." [*Id.* at p. 150:2–24]. The

"set" policies on the intranet "for the lieutenant [position]" require, as stated above,

"eight years' law enforcement experience, with four years of that being supervisory,"

but Defendants "put on the announcement" that "just 12 months' law enforcement

experience [was required] for a lieutenant, which is less than [what is required for] a

sergeant." [*Id.*].

   This relaxed requirement, however, doesn't open a door for Defendants to

promote Richardson because he's African-American. In reality, it did the opposite.

Requiring only "12 months of law enforcement experience" didn't yank Ingle from the

applicant pool so that Richardson could get promoted—the relaxed requirement (when

it comes to "police officer" experience) undeniably benefited Ingle as well because it

---

[24] Another about-face for Ingle: in his deposition, Ingle testified that an announcement *was made* on "[t]he intranet" for the Richardson Lieutenant Promotion, yet he still argued via his Statement of Additional Material Facts [Doc. 29-2] that the Richardson Lieutenant Promotion "was *not* announced." *Compare* [Doc. 40, Ingle Depo., p. 95:3] *with* [Doc. 29-2, ¶ 62] (emphasis added); *see also* n.23, *supra*.

stripped the supervisory experience requirement.[25] [*Id.* at p. 161:6–7]. Ingle was still a

contender with the relaxed requirement because he began working for the Department

in 2009, and Richardson came on board in 2012. Ergo, they both had at least 12 months

of law enforcement experience. [Doc. 29-2, ¶¶ 21, 28]. Therefore, in order to fill the

lieutenant position, Defendants may have changed the requirements, but this change

didn't inject disparate treatment into their policies or promotions—it leveled the

playing field.

When you continue reading the remaining requirements for the lieutenant

position, they also state that the applicant "[m]ust have . . . an excellent work record."

[Doc. 29-4, p. 81]. Perhaps the reason Ingle hasn't yet been promoted is as simple as

what Defendants contend shows his "general lack of effort." [Doc. 39, p. 7]. The Court

won't, of course, rehash those details again, but it is apparent that Ingle refuses to take

his personal shortcomings into consideration. It doesn't matter if Defendants' reason is

"a good reason, a bad reason, [or] a reason based on erroneous facts." *Gogel*, 967 F.3d at

1148. Rather, employment discrimination cases like this one are only concerned with

---

[25] In an earlier footnote, the Court briefly mentioned the parties' inclusion of sealed documents detailing prior supervisory experience. *See* n.20, *supra*. Some of these documents discuss roles Ingle and Richardson had with previous employers and how those roles are presumably supervisory in nature. However, whatever supervisory experience Ingle says he had under his belt or that Richardson had in comparison to him is irrelevant because Defendants *removed* the supervisory experience requirement from the equation across the board. *See, e.g.,* [Doc. 29-2, ¶¶ 6–7, 11]. That is why the outcome of this case doesn't depend on any supervisory-experience related argument.

one thing: did Defendants give an honest, nondiscriminatory reason for denying Ingle

these promotions? *Id.* at 1149. In this case, they absolutely did.

Over and over, the record supports Defendants' explanation that Richardson is

just a better employee than Ingle, and that fact alone puts the Court in no position to

interfere. *Id.; see, e.g.,* [Doc. 29-1, ¶ 24]; *see also* [Doc. 39, p. 7]. Given that there is no

evidence that Defendants' proffer of a "general lack of effort" is pretext masking

multiple forms of discrimination, this third argument, like his other attempts to

demonstrate a convincing mosaic of circumstantial evidence, also fails. Ingle simply

cannot present a convincing mosaic of discrimination based on the facts surrounding

his Title VII or § 1981 claims for the Richardson Sergeant Promotion or his § 1981 claim

for the Richardson Lieutenant Promotion.

Although the facts of this case are complicated, the law in the Eleventh Circuit to

which the Court must apply those facts is clear, and the Court must **GRANT** summary

judgment to Defendants on all of Ingle's discrimination claims.

*iii.*     *Ingle's Retaliation Claim Under § 1981*

Employers are prohibited from retaliating against "any . . . employee[] . . .

because he has opposed any practice made an unlawful employment practice" by Title

VII, "or because he has made a charge, testified, assisted, or participated in any manner

in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). As

mentioned above, Ingle asserts his retaliation claim under § 1981, not Title VII, and

47

while cognizable under both statutes, retaliation claims are analyzed under Title VII's

framework. *Gogel*, 967 F.3d at 1134 (citations omitted); *see* n.17 (citing [Doc. 1, p. 26]),

*supra*.

A retaliation analysis begins with establishing the prima facie case. Making a

prima facie case for retaliation requires a plaintiff to show that he engaged in statutorily

protected activity and suffered an adverse action that was causally related to the

protected activity.[26] *Gogel*, 967 F.3d at 1134–35 (citations omitted). Once established, the

prima facie case "creates a 'presumption that the adverse action was the product of an

intent to retaliate.'" *Id.* at 1135 (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir.

2009)). Then, the burden shifts to Defendants "to rebut the presumption [of retaliation]

by articulating a legitimate, [nondiscriminatory] reason for the employment action." *Id.*

"If [Defendants] produce[] such a reason, the presumption is rebutted, and the plaintiff

must then demonstrate that the 'proffered reason was merely . . . pretext," masking a

retaliatory action. *Id.* Thus, in order to succeed on his § 1981 retaliation claim, Ingle

must prove that had he not filed his EEOC charge complaining about Defendants'

allegedly discriminatory employment practices, Defendants would not have subjected

him to a "retaliatory campaign." *Id.* (citation omitted); [Doc. 29, p. 15]. This "campaign"

encompasses a series of actions: denial of a fifth promotion; drug testing following an

---

[26] "An action is materially adverse if it 'might have dissuaded a reasonable worker from making or reporting a charge of discrimination.'" [Doc. 29, pp. 15–16 (quoting *Burlington N. & Santa Fe Ry. Co v. White*, 548 U.S. 53, 56 (2006))].

automobile accident; a short suspension; more drug testing, this time following an injury while at work; and an allegation that Defendants "refused to assign" Ingle to light-work duty. [Doc. 29, pp. 15–17].

After he filed his EEOC charge, Ingle applied for another sergeant position, but he didn't receive this promotion either. [Doc. 39-2, ¶ 68]; [Doc. 29-2, ¶ 10]. Defendants promoted Gerald Garner. [Doc. 29-1, ¶ 10]. (Naturally, we'll call this one the Garner Sergeant Promotion.) Garner is also a white male, which knocks out race and sex as a possible basis to sue. But in a last attempt to wring out a valid claim from some federal employment discrimination statute, Ingle contends that Defendants denied him this promotion because he filed an EEOC charge. [Doc. 39-2, ¶ 70]. However, here's what the promotional board had to say with respect to Ingle and Garner's qualifications. *See generally* [Doc. 42-15].

Garner received five top-three rankings; Ingle received one from—guess who—his co-plaintiff, Collins. [*Id.*]; [Doc. 42-15, pp. 7–12]. And yes, we know that the recommendations provided by the promotional board are merely advisory, but the scores provided by Chief Jude, as the "final promotional decision" maker, clearly indicate, or show rather, nondiscriminatory reasons for promoting Garner over Ingle. *Compare* [Doc. 42-1, p. 1] *with* [Doc. 42-15, p. 6]; *see also* [Doc. 39-2, ¶ 34]. Ingle received a lower "General" score and received lower scores in "Training," "Dispatch," "Policies

and Work Instructions," "Education and Experience," and "Work History." [*Id.*]. And

not to pile on, but that's a lower score in *every category* possible.

Now, applying the burden-shifting scheme from *Gogel*, Ingle has to demonstrate

that Chief Jude's higher scores for Garner and lower scores for him were merely pretext

to cover up an intent to retaliate. 967 F.3d at 1134–35. This is an argument that Ingle

doesn't even attempt to make, and to the extent he hoped the Court would develop one

for him based on his previous pretext-related arguments, he is mistaken. *See* n.21, *supra*.

Instead, Ingle hedges his bets on the temporal proximity between his EEOC charge and

the Garner Sergeant Promotion. [Doc. 29, pp. 16–17]. He has to show a causal relation

between his EEOC charge and this latest failed promotional attempt, and he can show

this relation because the two events were separated by less than a month.[27] *Gogel*, 967

F.3d at 1134–35; *see* [Doc. 21-4, p. 3 (indicating January 24, 2018, as the date Ingle filed

his EEOC charge)] *in connection with* [Doc. 42-15, p. 1 (showing Chief Jude's promotional

board score sheet dated on February 21, 2018)]. But what he failed to do was follow

through with his final burden to demonstrate pretext and because Defendants met their

burden, they have rebutted the presumption of retaliation. *Gogel*, 967 F.3d at 1135

---

[27] The Eleventh Circuit Court of Appeals has recognized that "courts have 'uniformly [held] that the temporal proximity must be very close.'" *Grier v. Snow*, 206 F. App'x 866, 869 (11th Cir. 2006) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)) (citing with approval circuit court cases invalidating temporal proximities of three and four months).

(quoting *Bryant*, 575 F.3d at 1308). As such, Ingle cannot use the Garner Sergeant

Promotion to support a retaliation claim.

Second, Ingle claims that Chief Jude "made [him] a target within the

Department" when he announced to the promotional board (during interviews for the

Garner Sergeant Promotion) that EEOC charges had been filed "against [him]." [Doc.

29, p. 16]; [Doc. 29-2, ¶ 69]; [Doc. 29-4, Ingle Aff., ¶ 29]. Chief Jude, of course,

vehemently disputes that he ever discussed the EEOC charges for this case with either

Collins or Ingle or in their presence.[28] [Doc. 39-2, ¶ 69]; [Doc. 39-3, Jude Supp. Decl., ¶

6]. Faced with the classic "he said, she said" conundrum, Ingle's evidence, as the

nonmovant at summary judgment, is to be believed; so, the Court will draw this

inference in his favor and assume that Chief Jude made comments about and

announced that EEOC charges had been "filed against [him]." *Anderson*, 477 U.S. at 255,

*supra*; [Doc. 29-2, ¶ 69]. These target-placing comments supposedly spurred repeated

drug tests, humiliating employment practices, and suspension of employment—all of

which, according to Ingle, constitute adverse employment actions to sustain his

retaliation claim. [Doc. 29, p. 16]. The Court looks at each in turn.

---

[28] Ingle contends that during the interviews with the promotional board (which would have been in Collins' presence since he is a member of the promotional board), Chief Jude advised that he "had an EEOC [c]harge filed against [him] for racial discrimination. Dot your I's and cross you[r] T's. Make sure you have got everything in order." [Doc. 29-2, ¶ 69].

In May 2018, Ingle rear-ended another automobile in one of the Department's patrol cars "while on duty as a [p]olice [o]fficer." [Doc. 29-4, Ingle Aff., ¶ 30]; [Doc. 22, Jones Decl., ¶ 14]. Although he did not receive a citation, he did submit to a standard drug test that same day pursuant to the Department's Guidelines for Alcohol & Drug Testing.[29] [Doc. 29-4, Ingle Aff., ¶ 30]. Several days later, the captain for the Department informed Ingle that Employee Health wanted another test "for some reason." [*Id.*]. When Ingle arrived at Employee Health, he was advised that "the first test 'came back diluted' because [he] drank too much water." [*Id.*]. When he went to provide this second urine sample, "an unknown male followed [him] into the bathroom and stated, 'I've got to actually watch it come out.'" [*Id.*]. Ingle states that this did not happen when he provided the first urine sample and that he initially refused to let the Employee Health representative watch him urinate. [*Id.*]. But once he was advised that he would be terminated[30] if he didn't "let the unknown man watch him," Ingle subsequently complied but was suspended pending the results of the second urine sample. [*Id.* at ¶¶ 30–31].

---

[29] In relevant part, the Guidelines for Alcohol & Drug Testing state that
> All employees involved in an accident while operating a Navicent Health owned vehicle shall submit to controlled substance testing, as soon as practical after the accident has been reported. If there is a suspicion that the employee was under the influence of alcohol at the time of the injury the employee will also be tested for alcohol as soon as possible but within 3 hours of the time of the accident is reported.

[Doc. 22-6, Jones Decl., pp. 3–4].

[30] As for termination the Guidelines for Alcohol & Drug Testing state, "Failure to submit to any testing required under this policy shall be deemed insubordination and the employee shall be terminated." [Doc. 22-6, Jones Decl., p. 5].

"[U]pset and humiliated," Ingle says he "[knew] that the [o]fficers in the Department would interpret [his] suspension as confirmation that [he] violated some rule or policy." [*Id.* at ¶ 31]. Ingle, however, argues that nothing in the Guidelines for Alcohol & Drug Testing require suspension until the results come back. [*Id.*]. While this may be true, "[i]f an . . . employee's drug test results are diluted, it *is* standard practice with Navicent's Worker's Compensation department to have the employee submit to a *witnessed* drug screen." [Doc. 22, Jones Decl., ¶ 13] (emphasis added). But, by Defendants' account, "it is [also] standard practice to suspend the employee, pending the results of the second test." [*Id.*]; [Doc. 39-4, Proctor Decl., p. 5]. If the second test yields a positive result, the suspension is without pay. [Doc. 22, Jones Decl., ¶ 13]. But if it's negative, the suspension is with pay.[31] [*Id.*].

To defeat Ingle's retaliation claim as it pertains to drug testing, Defendants erroneously argue that Ingle can't show that Defendants conducted his drug screening any different from how they would screen other employees. [Doc. 39, p. 8]. However, taking a quick glance to the burden-shifting scheme outlined above for a retaliation claim, there is no requirement that the employee point to a comparator. *Gogel*, 967 F.3d

---

[31] It seems only proper to note that Ingle is correct in his position that the Department's policies are silent on the issue of suspension. [Doc. 29-1, ¶ 89]. He says suspension is not in the Department's policies, and the Court accepts this as fact because his allegation is sufficiently supported by evidence in the record. *Sconiers*, 946 F.3d at 1263, *supra*. Nowhere in the materials citied by the parties (other than in a self-serving declaration from Navicent Health's Chief People Officer Clinton Jones) is the standard practice of suspension mentioned. *See* [Doc. 39, p. 8]; [Doc. 22, Jones Decl., ¶ 13]; *see, e.g.,* [Doc. 22-6, pp. 3–4]; Doc. 39-4, Proctor Decl., p. 5].

at 1134–35; *Vinson v. Macon-Bibb Cnty.*, No. 5:18-cv-00306-TES, 2020 WL 2331242, at *10 (M.D. Ga. May 11, 2020) ("*Vinson II*") (" . . . [R]etaliation claims do not require the use of a comparator."). Regardless of whether suspension is the standard practice when awaiting the results of a second urine sample, *Gogel* and a litany of other cases tell us that Ingle has to suffer an adverse employment action that is causally related to the filing of his EEOC charge. 967 F.3d at 1134–35 (citations omitted).

Hands down, Ingle hit another vehicle while on duty. [Doc. 29-4, Ingle Aff., ¶ 30]; [Doc. 22, Jones Decl., ¶ 14]. So, to the extent he makes the argument that the drug tests themselves constituted adverse employment actions, it crashes—quickly. Drug tests are unequivocally part of the Guidelines for Drug & Alcohol Testing following accidents involving the operation of a Navicent Health owned vehicle.[32] [Doc. 22-6, p. 3]. However, if he is making the argument that his suspension was an act of retaliation, it could fail on temporal-proximity grounds alone because his suspension didn't occur

---

[32] Ingle cites to *Adams v. City of Montgomery*, where a district court "determined that [a] drug test was an adverse action." 569 F. App'x 769, 774 (11th Cir. 2014). In *Adams*, the plaintiff "theorize[d]" that a personnel department representative "became aware of his intent to sue and decided to" have the plaintiff "drug tested, in hopes that he would test positive and, thereby, be terminated." *Adams v. City of Montgomery*, 2013 WL 5441857, at *4 (N.D. Ala. Sept. 27, 2013), *aff'd* 569 F. App'x 769, 774 (11th Cir. 2014). However, what Ingle coincidentally omits from his argument is that the district court in *Adams* clearly recognized that "submitting to drug and alcohol screening is, for some employees, a non-offensive and expected part of the job, [but] being singled out and accused of using drugs or alcohol on the job is not a typical, petty, or trivial workplace experience." *Id.* at *13. Ingle wasn't "singled out" because of his EEOC charge, he had to take a drug test because *he rear-ended someone* while on duty in a Navicent Health patrol car. *Id.*; [Doc. 22, Jones Decl., ¶ 14]. To think that Defendants used drug testing under these circumstances as a retaliatory mechanism against Ingle defies common sense. True, the first test appears to be a non-issue for Ingle because it was an "expected part of" his job, but he was still expected to submit to the witnessed drug test when the initial test "came back diluted." *Adams*, 2013 WL 5441857, at *13; [Doc. 29-4, Ingle Aff., ¶ 30]; [Doc. 39-4, Proctor Decl., p. 5]; [Doc. 40, Ingle Depo., pp. 199:24—200:3].

until May 2018—over three months after he filed his EEOC charge. *See* n.27, *supra*; *see also* [Doc. 21-4, p. 3] *in connection with* [Doc. 29-4, Ingle Aff., ¶ 30]. But because it may be too close to call, in light of the three-to-four-month window, the Court, out of an abundance of caution, basis its ruling on the absence of an adverse employment action. Regardless of whether his suspension is causally related to him filing his EEOC charge, it's not (under the circumstances of this case) an adverse employment action.

Actions that deprive an employee "of compensation which he otherwise would have earned clearly constitute adverse employment actions." *Smith v. Fla. A & M Univ. Bd. of Trs.*, --- F. App'x ----, 2020 WL 5949801, at *6 (11th Cir. 2020). His drug test came back negative; thus, his suspension was with pay. No harm, no foul here. *Jones v. Aaron's Inc.*, 748 F. App'x 907, 917 (11th Cir. 2018) (citing *Burlington N. & Santa Fe Ry. Co v. White*, 548 U.S. 53, 67–68 (2006)); [Doc. 22, Jones Decl., ¶ 13]; [Doc. 29-4, Ingle Aff., ¶ 30]. Notwithstanding his statement that he was "upset" about how his co-officers might interpret his suspension, because of its short duration and the fact that it was with pay, it doesn't amount to the level of "material adversity" needed to make a successful retaliation claim. *See Burlington N.*, 548 U.S. at 54; [Doc. 29-4, Ingle Aff., ¶¶ 30–31].

Next, Ingle mentions that he was subjected to another "humiliating drug test" following an incident where he was "struck in the face by a patient receiving psychiatric treatment." [Doc. 29-4, Ingle Aff., ¶ 32]; [Doc. 29, p. 17] After the incident, a surgeon at Navicent Health examined Ingle and "determined that he could return to [his] post."

[Doc. 29-4, Ingle Aff., ¶ 32]. The Department's captain allowed Ingle to return to work, but "about an hour later," the captain informed Ingle that Chief Jude "called and said [he] need[ed] to go through the whole thing—go take a urine test and all that." [*Id.*].

This drug test, however, occurred in August 2019. [*Id.*]. Notably, there is nothing in the record to indicate that Ingle submitted a Confidential Employee Occurrence Report ("COER") for this "on the job injury" which would have required him to "submit to controlled substance testing . . . after the accident ha[d] been reported." *See* [Doc. 22-6, p. 3]. In other words, had Ingle submitted a CEOR following this "on the job injury," he would have been required to "submit to controlled substance testing." [Doc. 39-4, Proctor Decl., p. 3]. And since there is nothing in Ingle's affidavit or his deposition indicating that he submitted a CEOR it raises the question: why did Chief Jude make Ingle take another drug test? Other than the fact that Ingle sustained an "on the job injury," Defendants don't provide any reasoning as to why Ingle was made to take a drug test following this incident with the psychiatric patient. [*Id.*]; [Doc. 29-4, Ingle Aff., ¶ 32]. Thus, because Navicent Health's Guidelines for Drug and Alcohol Testing only state that drug testing is required for "employees who submit" a CEOR, it appears that Defendants might not have had a reason for requiring this specific drug test. [Doc. 39-4, Proctor Decl., p. 3]. Sure, "[a]ll employees of Navicent Health are subject to random drug testing[,]" but Defendants didn't offer this as a nondiscriminatory reason for making Ingle take another drug test. [*Id.* at p. 4]. The Court, though, is still not

convinced that simple drug testing and whatever interpretations an employee's co-workers might conjure up amount to anything more than trivial expectations for jobs like Ingle's. *Adams v. City of Montgomery*, 2013 WL 5441857, at *13 (N.D. Ala. Sept. 27, 2013). Even if this drug test could somehow be seen as an adverse employment action (and the Court believes it cannot under the circumstances of *this* case), Ingle still cannot sustain a retaliation claim because the drug test is wholly removed from both instances of protected activity.

The adverse action must be causally related to the protected activity, and the temporal proximity between the two "must be very close." *Gogel*, 967 F.3d at 1134–35 (citations omitted); *see* n.27, *supra*. Nine months passed between this drug test and the filing date of the Complaint, and 18 months passed between the test and his EEOC charge. *See* [Doc. 21-4, p. 3] *in connection with* [Doc. 1, p. 31] *and* [Doc. 29-4, Ingle Aff., ¶ 32]. "If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Grier v. Snow*, 206 F. App'x 866, 869 (11th Cir. 2006) (citing *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004)). Given that there is no "other evidence" showing that Ingle faced adverse employment actions via any drug test or suspension, he cannot assert a valid retaliation claim. *Id.*

"Following Defendants' [allegedly] unlawful employment practices," Ingle alleges that he "began suffering from severe emotional distress and stress, causing

sleepless nights and instances where [his] heart races beyond control." [Doc. 29-2, ¶ 91]. This prompts Ingle's final contention that Defendants retaliated against him when they "refused to assign" him to a light-duty job despite his physicians' recommendations. [Doc. 29, p. 16]; [Doc. 29-2, ¶¶ 91–92]. Before delving too deep into this last allegedly retaliatory action, we need to know the basis for it.

At the time of his deposition, Ingle testified about his "heart issue" for which his doctors recommended a defibrillator that would necessitate light-duty work "for a month after" its insertion. [Doc. 40, Ingle Depo., p. 200:11–21]. However, before the heart issue, Ingle had already been out of work for a medical issue related to his throat, but he claims that he returned to work early because Defendants were not "going to hold [his] job." [*Id.* at pp. 200:25—201:1, 201:24—202:2]. Then, "[f]or [his] heart issue, [he] was supposed to be out . . . for 30 more days." [*Id.* at p. 201:3–7]. When he discussed his extended leave with Chief Jude, Ingle "didn't know that [he] was out" of medical leave, and he says that because Defendants do not have an internal "process" to "find [him] a light-duty job" or "hold [his] job," they have "prevent[ed] [him] from receiving a needed medical treatment." [*Id.* at pp. 200:16–17, 201:5–9]; [Doc. 29, p. 16]. Ingle "firmly believes" that before he filed his EEOC charge or this lawsuit, Defendants "would have had no problem" holding his job. [*Id.* at p. 201:15–17]. And because Ingle says they wouldn't, he's claiming retaliation.

On this, Defendants first object to the Court's consideration of any allegation that they "refused to assign light duty" because it "is outside the scope of the Complaint." [Doc. 39, p. 8 (citing [Doc. 1, ¶ 103])]. While Ingle doesn't make this specific allegation (nor could he since his health issues didn't arise until months after he and Collins filed the Complaint), Ingle claims that "[a]s a proximate and direct result of Defendants' conduct, [he] has suffered and will continue to suffer damages including emotional distress, inconveniences, . . . and other indignities." [Doc. 1, ¶ 106]; [Doc. 40, Ingle Depo., p. 202:11–20]. Second, assuming that conclusory allegation is sufficient to incapsulate Defendants' refusal to temporarily assign Ingle a light-duty job, Defendants object to his attempt "to provide an opinion on medical causation" as a layperson. [Doc. 39-2, ¶ 94]. And third, Defendants argue that "physicians['] recommend[ations]" for "a defibrillator implant" and assignment to light duty "for a month" cannot be established as fact since there are "[n]o medical records [to] corroborate Ingle's self-serving statements." [*Id.* at ¶ 92].

Generally speaking, Defendants first argument to defend their alleged refusal to temporarily assign Ingle a light-duty job is that Ingle did not properly plead the employment action to support his retaliation claim. True, while a plaintiff "cannot seek to amend his complaint in response to a motion for summary judgment," Defendants undoubtedly knew of Ingle's allegations before they filed their summary-judgment motion. [*Id.* at ¶ 95 (citing *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th

Cir. 2004) (per curiam))]; *see also* [Doc. 40, Ingle Depo., pp. 202:21—203:4]. However,

Defendants don't have to prove Ingle's case for him. *See Four Parcels*, 971 F.2d at 1437–

38 (quoting *Celotex*, 477 U.S. at 323), *supra*. At summary judgment, Defendants only

need to point out an absence of evidence that would support Ingle's retaliation claim.

*Id.* This, they have done via their other arguments relating to the light-duty assignment.

Nothing in the record pertaining to Ingle's heart condition, much less any admissible

evidence, shows how any heart condition could be proximately linked to the allegations

asserted in this lawsuit. In fact, when responding to "medical treatment" in Defendants'

interrogatories (the only evidence reviewable by the Court), Ingle only said that "[he] is

currently receiving medical treatment, as described herein[,]" and that "[t]he cause of

[his] medical condition is currently unknown." [Doc. 42-6, pp. 17–18]. But the rest of

Ingle medical treatment—"as described herein"—is redacted. [*Id.* at p. 20].

Again, there is no temporal proximity evidence regarding this alleged

employment action because it came about long after Ingle filed his EEOC charge and

initiated this lawsuit. Second, because he cannot testify as to medical causation, Ingle

has virtually nothing on which to substantiate the allegation that Defendants refused to

assign him light-duty work, and he cannot use such unsubstantiated allegations to

support his retaliation claim. *See* n.27, *supra*.

Thus, none of Defendants' alleged employment actions constitute retaliation, and the Court **GRANTS** summary judgment to Defendants on Ingle's § 1981 retaliation claim.

### b.    *Collins' Discrimination Claims*

With Ingle's federal claims disposed of, the Court addresses Defendants' employment practices that Collins contends are illegal. Without a doubt, Title VII and § 1981 prohibit workplace discrimination on the basis of sex and race. As stated above, "[t]he language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices that have been used to disadvantage" employees on the basis of those (and other) protected characteristics. *Lewis I*, 918 F.3d at 1220 (quoting *McDonnel Douglas*, 411 U.S. at 800). Collins, in opposing Defendants' Motion, likewise argues that application of *McDonnell Douglas* to his claims precludes summary judgment. [Doc. 29, pp. 6–13].

To recap, Collins has been with the Department since February 2000, nine years longer than Petit and 12 years longer than Richardson. [Doc. 39-2, ¶¶ 20, 24, 28]. In 2013, Collins received a promotion to sergeant, but he has not been promoted since, despite his application for the Petit Lieutenant Promotion in early 2017. [*Id.* at ¶¶ 36–37]. Obviously, Collins' Title VII claim and his § 1981 claim originate from Defendants' failure to promote him to the rank of lieutenant within the Department, and since the underlying facts for both claims are the same, "[t]he same analysis—and in particular,

the *McDonnell Douglas* burden-shifting framework" will apply to both. *Lewis I*, 918 F.3d at 1220 n.5 (citing *Standard*, 161 F.3d at 1330). Under this framework, we already know that a plaintiff establishes a prima facie case for discrimination, in the failure-to-promote context, when he can show that (1) he is a member of a protected class, (2) he was qualified and applied for the promotion, (3) he was rejected despite his qualifications, and (4) other equally or less qualified employees who were not members of the protected class were promoted. *Wilson*, 376 F.3d at 1089 *abrogated on other grounds by Lewis I*, 918 F.3d at 1218; *McDonnell Douglas*, 411 U.S. at 802.

Collins admits that he did not apply for the Richardson Lieutenant Promotion, an admission upon which Defendants immediately bring to the Court's attention in an effort to defeat his failure-to-promote claim. [Doc. 39-2, ¶ 53]. In making this argument, Defendants rely on a previous decision by the Court in another case: *Vinson v. Macon-Bibb Cnty.*, No. 5:18-cv-00306-TES, 2019 WL 1495273, at *4 (M.D. Ga. Apr. 9, 2019) ("*Vinson I*"). In *Vinson I*, the Court took the requirements of "a prima facie case [for] discriminatory failure to promote" as prescribed by the Eleventh Circuit Court of Appeals in *Combs v. Plantation Patterns* and ruled that the "[p]laintiffs' failures to formally apply for the . . . position [were] fatal to their" claims. 2019 WL 1495273, at *4 (citing *Combs*, 106 F.3d 1519, 1239 n.11 (11th Cir. 1997)). Importantly, however, Collins points out exceptions to Defendants' position that the *Vinson* plaintiffs never advanced.

"Generally," Collins acknowledges that a plaintiff asserting discrimination related to a failure to promote "must establish, *inter alia*, that [he] was qualified and *applied for the promotion*." [Doc. 29, p. 7] (emphasis added). However, he aptly notes that under current Eleventh Circuit precedent, "a non-applicant may nonetheless establish a prima facie case by showing that [he] refrained from applying due to a justifiable belief that the employer's discriminatory practices made application a futile gesture." [*Id.* (quoting *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1274 (11th Cir. 2002) (per curiam))]. In other words, to invoke this exception to the application requirement, a plaintiff must demonstrate that (1) he had "a real and present interest in the job for which the employer was seeking applications" and (2) that he "would have applied for the job but effectively was deterred from doing so by the employer's discriminatory practices." *Joe's Stone Crabs*, 296 F.3d at 1274. Practices that, according to Collins, entail Defendants' statements about what is really required for a promotion within the Department. [Doc. 29, p. 8 (citing [Doc. 29-2, ¶¶ 40, 62–63])].

There is no doubt that Collins had a real and present interest in being promoted to lieutenant. *Joe's Stone Crabs*, 296 F.3d at 1274. He repeatedly expressed a desire to be promoted. [Doc. 29-2, ¶ 35]. However, what Collins can't express, or demonstrate rather, is that Defendants used discriminatory practices to prevent him from applying for the Richardson Lieutenant Promotion. *Joe's Stone Crabs*, 296 F.3d at 1274. Previously, the Court stated that it would have to discuss certain actions and employment

decisions. Some of these actions and decisions serve as the bases of Collins' sex- and age-discrimination claims from the Petit Lieutenant Promotion which, as discussed above, are time-barred. *See* Discussion, Section (B)(1)(b), *supra*. Nevertheless, there are important allegations surrounding the Petit Lieutenant Promotion that play an intrinsic role in explaining why Collins' believes he was discriminated against with respect to the Richardson Lieutenant Promotion. Broadly speaking, Collins' Title VII and § 1981 race-discrimination claims arising from the Richardson Lieutenant Promotion are predicated on what happened with regard to the Petit Lieutenant Promotion.

The gravamen of this intricate series of events can best be surmised as Collins taking issue with Chief Jude's statement following the Petit Lieutenant Promotion. *See* [Doc. 29-2, ¶ 50]. According to Collins, Chief Jude told him that he "need[ed] a college education" because "administration [was] pushing for a college education for these positions." [Doc. 29-2, ¶ 50]; [Doc. 29-3, Collins Aff., ¶ 18]. Case and point, that's why Collins says he didn't apply for the Richardson Lieutenant Promotion. But how does all of this fit together?

"In Spring 2017," the Department announced a vacant lieutenant position, which the Court labeled the Petit Lieutenant Promotion. [Doc. 29-2, ¶ 46]. For that vacancy, Collins argues that Defendants changed the requirements for the position and "re-opened" it so that a "pre-determined candidate," Petit, could "submit an untimely application." [*Id.* at ¶ 48]; [Doc. 29, p. 8]. These actions and employment decisions,

assuming they occurred, are the core of Collins' sex- and age-based discrimination claims arising out of the Petit Lieutenant Promotion, but because they are time-barred there is no reason to discuss them further. The only actions and employment decisions from the Petit Lieutenant Promotion with which the Court is concerned are those Collins uses to support his race-discrimination claim for the Richardson Lieutenant Promotion.

Ultimately, we know that Defendants promoted Petit to the rank of lieutenant over Collins and the other applicants, but when Collins learned that he had not been promoted, he filed a grievance with Navicent Human Resources. [*Id.* at ¶¶ 47, 50, 54]. In relevant part, his grievance states:

> I recently applied for the [l]ieutenant's position with hospital police. Sgt. Dana Petit was given the position. During my meeting with Chief Jude and Capt. Crowder, they informed me that I did not get the position, despite my 20 years and over [four] years supervisory experience, because I do not have a college degree. Petit has a degree and is discussing going back for her [m]aster's degree. They informed me that Tim Slocumb and Administration are pushing toward college education for supervisory positions, despite the fact that this is not included in the job requirements as listed on the intranet and in Human Resources for the [l]ieutenant position. . . . They again reiterated that they are looking for someone with a college degree, and if I want to further myself in th[e] [D]epartment, I will need a college education.

[Doc. 22-8, Jones Decl., p. 8]; [Doc. 29-2, ¶ 51]. After reviewing it, Chief Jude responded to Collins' grievance stating that he "did advise [Collins] that the [Department] is supporting higher education for all employees for advancement opportunities." [Doc. 22-8, p. 11]. He also confirmed that higher education "is not required by [the lieutenant]

job description, but [having one] shows your willingness to improve your education, training, and skills to be a better performer . . . ." [*Id.*].

Based on this (and what Chief Jude described as "other things," which Collins chalks up to mean his "race, age, and [sex]"), Collins "did not subsequently apply for the Richardson Lieutenant Promotion." [Doc. 29-2, ¶ 53]. This turns the key for his futility-of-application argument just discussed. Essentially, Collins argues that he "couldn't" apply for the Richardson Lieutenant Promotion because any application for a lieutenant position within the Department would be futile without a college degree. [Doc. 42, Collins Depo., pp. 235:5—236:17 (noting that "[j]ust . . . once" "Chief Jude told [Collins] that [he couldn't] apply because [he didn't] have a college degree")]. Thus, from Collins' point of view, Chief Jude "broke certain policies and procedures . . . to promote . . . a black male" given that the job description for the lieutenant position doesn't require a college degree. [*Id.* at pp. 233:21—234:4]; [Doc. 29-4, pp. 78–82].

This purported "futility," however, is not based on a discriminatory practice—one where it would be futile for a white man to apply for the sheer fact that he's white—it's based on an employer wanting (but not requiring) applicants for a supervisory position to have a college education. Notably, Chief Jude only stated that Collins "need[ed] a college education" (perhaps to be successful in receiving a lieutenant position), but nowhere did he say that one was *required* to apply. [Doc. 29-2, ¶ 50]; *see also* [Doc. 29-3, Collins Aff., pp. 85, 88 (noting that the chief and captain

positions require a bachelor's degree and an associate's degree, respectively, to apply)];
[Doc. 22-8, p. 11].

In briefing, Defendants (with respect to the Petit Lieutenant Promotion) admitted that Collins and Petit were both qualified, "but because Petit showed more effort and attained a higher level of education," they found that she was the better candidate. [Doc. 39, p. 7]; *see also Denney v. City of Albany*, 247 F.3d 1172, 1185 (11th Cir. 2001) ("Absent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext under Title VII or other federal employment discrimination statutes."). Federal anti-discrimination laws do not obligate Defendants "to [promote] the minority or female applicant whenever that person's objective qualifications were equal to those of a white male applicant." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981). "Rather," Defendants have "discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." *Id.* It's a simple as that. Defendants chose Richardson for the Richardson Lieutenant Promotion because his college education made him the better candidate.

So, despite Collins lacking a college education (subjectively making him the lesser-qualified candidate), he claims that Defendants discriminated against him when they promoted Petit to lieutenant over him because she's a woman and because she was younger than him. Then, based upon Defendants' allegedly discriminatory practices on

the basis of sex and age (for the Petit Lieutenant Promotion), Collins says he didn't apply for the Richardson Lieutenant Promotion—a race-based discrimination claim. That's quite the logical leap.

All things considered, its presence on the job description or not, higher education certainly makes an applicant more competitive, and there is nothing discriminatory about an employer wanting college-educated individuals to fill certain positions. Thus, without showing the requisite "discriminatory practice"—say, some evidence that Defendants require white males over the age of 40 to be college educated before they can receive a promotion or an outright ban on promoting Catholics, for example— Collins cannot show that his application would have been futile. *Joe's Stone Crabs*, 296 F.3d at 1274. Nevertheless, the Court must press on because there is another exception Collins argues he meets—the informal-processes exception. *See Williams v. VWR Int'l, LLC,* 685 F. App'x 885, 887–89 (11th Cir. 2017).

"Similarly," Collins contends that "where an employer utilizes informal hiring processes, a plaintiff need not express an interest in a position." [Doc. 29, p. 7 (citing *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1132–34 (11th Cir. 1984))]. When it comes to informal hiring, or in this case, promotional processes, Collins' argument warrants some discussion due to Defendants' employment actions between the Richardson Sergeant Promotion and the Richardson Lieutenant Promotion.

Generally speaking, Collins believes he was overlooked for the Richardson Lieutenant Promotion because of Defendant's "informal processes." *See* n.24, *supra*. "[W]hen an employer uses . . . informal methods it has a duty to consider all those who might reasonably be interested, as well as those who have learned of the job opening and expressed an interest." *Carmichael*, 738 F.3d at 1133. As for the prima facie case for a failure-to-promote claim, Collins will not have to show that he applied for the position if he can show that Defendants didn't announce the position and used informal and subjective procedures to identify a candidate. *Williams*, 685 F. App'x at 887 (quoting *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005)).

At the time of the Richardson Sergeant Promotion, Collins was already a sergeant, so he wouldn't have applied for a lateral move. *See* [Doc. 29-2, ¶ 37]. In other words, since Defendants considered applications directly from the Richardson Sergeant Promotion when filling the Richardson Lieutenant Promotion, Collins would not have had an application in the pool for consideration. [Doc. 23, Jude Decl., ¶ 23]. Thus, Defendants—mindful of administration's preference for college-educated individuals to hold certain ranks within the Department and already aware of the fact that Collins did not hold have a college education—simply recycled the Richardson Sergeant Promotion applications for the Richardson Lieutenant Promotion.

Yes, this may seem informal, but for a federal court to second-guess this process—a process ostensibly carried out so that Defendants could select applicants

who had college educations—would improperly make it act as a super-personnel department. *Alvarez*, 610 F.3d at 1265. Once again, it is not discriminatory for an employer to select one applicant over another based on differing levels of education. Federal discrimination laws are only concerned with whether an employer took an action for a discriminatory reason, and there is absolutely no evidence (pretextual or otherwise) that Defendants hatched an elaborate scheme to discriminate against Collins by recycling this particular pool of applications. *Gogel*, 967 F.3d at 1148–49.

Much to Collins' chagrin, Defendants' preferential trend for a college education for certain positions seems to be the case seeing that Richardson holds a bachelor's degree in "Justice Studies" and Ingle holds a bachelor's degree in "Political Science and Public Administration." [Doc. 22-4, p. 19]; [Doc. 29-1, ¶ 9]. This just further goes to explain why Defendants recycled the applicant pool from the Richardson Sergeant Promotion—preferred college-educated applicants were already in the mix. So, even if Collins would have applied for Richardson Lieutenant Promotion despite the informal process, the evidence shows that race still would not have played a factor in the decision to promote Richardson. *See Joe's Stone Crabs*, 296 F.3d at 1274, *supra*. Education and notable differences in past performance might have, but not race. And while Collins may forever argue that Defendants' employment actions were unfair, there is nothing illegal about preferring individuals with a college education to fill certain positions. However, given that the Eleventh Circuit Court of Appeals has "not given a

precise definition or test for what constitutes an informal hiring process," the Court errs on the side of caution and concludes that Collins meets the informal-processes exception. *Williams*, 685 F. App'x at 887. Thus, Collins will not have to show that he applied for the Richardson Lieutenant Promotion when making his prima facie case for his race-based failure-to-promote claim.

As odd as it may seem, we, once again, have to revisit what happened with the Petit Lieutenant Promotion. Although the claims from the Petit Lieutenant Promotion are time-barred, Defendants offered a slew of legitimate, nondiscriminatory reasons for that employment decision as well that, without a doubt, could carry into future employment decisions. To name a few, there is Petit's higher education, her superior computer skills,[33] and Collins' "childish" responses for one of his self-evaluations on which he "identified 'came in to [*sic*] work' as his greatest employment for the fiscal year" and "'stay employed and try not to get any more points' as his goal for the upcoming fiscal year." [Doc. 29-1, ¶¶ 18–20, 43]; [Doc. 22-8, p. 11 ("[Collins] was told that he needed to improve his basic computer skill set.")]. These all play a role in

---

[33] On computer skills, Collins argues that such a reason in denying him the Petit Lieutenant Promotion is pretext seeing as "computer deficiencies did not preclude [him] from being promoted" to the rank of sergeant. *See* [Doc. 29, p. 12 (discussing Collins' pretext arguments)]; *compare* [Doc. 22-7, pp. 2–5 (sergeant job description)] *with* [Doc. 29-4, pp. 79–82 (lieutenant job description)]. Thus, according to his thought process, a lack in "proficiency with Word, Excel, or other programs" should not have prevented his promotion to the rank of lieutenant. [Doc. 29, p. 12]. While Collins is correct in that neither the sergeant nor the lieutenant job descriptions require a specific proficiency with word processing programs, they both state that the "[c]andidate must" have a "high level" of written skills. *Compare* [Doc. 22-7, p. 3] *with* [Doc. 29-4, p. 81]. But without any evidence that Collins' written skills surpass Petit's (or really Richardson's), this pretext argument doesn't hold water.

Defendants' "exceedingly light" burden to articulate legitimate, nondiscriminatory reasons for not promoting Collins with respect to the time-barred claims arising out of the Petit Lieutenant Promotion. *Cotton v. Enmarket Inc.*, 809 F. App'x 723, 725 (11th Cir. 2020) (quoting *Smith v. Horner*, 839 F.2d 1530, 1539 (11th Cir. 1988)).

Looking at the evidence in this case, Defendants clearly made their promotional decisions based on Petit and Richardson's college educations and a comparison of their overall attitude and work performance with Collins'. Understandably, Defendants wouldn't promote someone whose self-described greatest accomplishment for the year was "[coming] in to [*sic*] work." [Doc. 29-1, ¶ 18]. In fact, *both* the lieutenant and sergeant job descriptions clearly indicate that "tak[ing] initiative" and "continuing to develop personally and professionally" are major behaviors considered for promotional opportunities. [Doc. 29-4, p. 79]; *see also* [Doc. 22-7, p. 2]. Simply put, Defendants' promotional decisions aren't the result of discriminatory practices. Instead, they clearly show that Defendants chose not to reward Collins' flippant attitude when it comes to his job. Yes, his "childish" responses may be the result of how Collins previously viewed his job, but nevertheless, he chose to make those responses and there is nothing discriminatory about Defendants looking back to them when considering who would be the best fit for a promotion within the Department. [*Id.* at ¶ 20]. Thus, just as with Ingle's claims, Defendants' arguments that Collins cannot make a prima facie case of

discrimination and their proffered nondiscriminatory reasons are all one in the same, taking us directly to a pretext analysis. *See* Discussion, Section (B)(2)(a)(i), *supra*.

Pretextually speaking, Collins argues that Defendants "are not concerned with college degrees." [Doc. 29, pp. 11–12]. Having unraveled the interwoven claims in this case, we are left with one final question pertaining to discrimination claims: is Defendants' preference for college-educated individuals to fill certain positions within the Department masking the true reason for denying Collins a promotion to the rank of lieutenant? *Gogel*, 967 F.3d at 1135.

Relying on *Pinder*, Collins argues that "[i]f Defendants . . . actually . . . believed a college degree was an important factor to considered when promoting officers, [they] would have made it a requirement for the position." [Doc. 29, pp. 11–12]; 11 F. Supp. 3d at 1219–20. This just isn't enough to show pretext. Defendants have already admitted that Collins was qualified for a lieutenant promotion, but they also have *consistently* admitted that higher education makes a candidate *the* better candidate. [Doc. 39, p. 7]; *see also Gogel*, 967 F.3d at 1136. Despite the exceptionally dense record, there is simply no evidence by which a reasonable jury could find that but for Collins' race he would have received the Richardson Lieutenant Promotion. *Gogel*, 967 F.3d at 1138.

As for Collins' attempt to demonstrate a convincing mosaic of discrimination, his arguments are centered around some more Chief Jude's statements surrounding the Petit Lieutenant Promotion. [Doc. 29, pp. 13–15]. These statements, used to support his

time-barred sex- and age-discrimination claims arising out of that promotion, cannot be used to construct a mosaic to show race discrimination. Even still, there is no circumstantial evidence in this case to warrant an inference of intentional discrimination with respect to the Richardson Lieutenant Promotion. *Lewis I*, 918 F.3d at 1220 n.6 (citing *Lockheed-Martin Corp.*, 644 F.3d at 1328). As such, the Court **GRANTS** summary judgment to Defendants on Collins' Title VII and § 1981 race-discrimination claims.

### 3.    Plaintiffs' State-Law Claims

Finally, Plaintiffs assert two state-law claims: negligent hiring, retention, and supervision and intentional infliction of emotional distress. [Doc. 1, pp. 27–30]. Citing to O.C.G.A. § 34-7-20, Plaintiffs argue that "[t]he employer is bound to exercise ordinary care in the selection of employees and not to retain them after knowledge of incompetency . . . ," to support their claim for negligent hiring, retention, and supervision claim. Even though O.C.G.A. § 34-7-20 deals with whether an employer may be liable for hiring or retaining an employee the employer knows is not suited for the particular employment, "Plaintiffs essentially attempt to create a [state-law] negligence cause of action for discrimination in employment." *Graham v. City of Duluth*, 759 S.E.2d 645, 650–51 (Ga. Ct. App. 2014); *Alford v. Cosmyl, Inc.*, 209 F. Supp. 2d 1361, 1372 (M.D. Ga. 2002). Turning this case inside out, Plaintiffs argue that Navicent Health is liable under this claim because it was aware of "Chief Jude's propensity to injure[]"

employees via discrimination and still retained him as an employee with the power to "hir[e] and promot[e] officers[] and otherwise manag[e] the daily operation of the Department." [Doc. 29, p. 18]; [Doc. 29-2, ¶ 17].

> Judge Land perfectly addressed this exact issue:
>
> Acceptance of Plaintiffs' creative legal theory would result in making virtually every employment discrimination claim actionable under [state-law] negligence principles. If the State of Georgia desires or intends to provide its citizens with a [state-law] remedy for employment discrimination, it has the means to do so through legislation enacted by the Georgia General Assembly. Absent a statutory or clear common law duty, th[e] Court has no authority to abandon judicial restraint and create a new [state-law] cause of action for employment discrimination.

*Alford*, 209 F. Supp. 2d at 1372. Accordingly, Defendants are entitled to summary judgment to Defendants on Plaintiffs' state-law claim for negligent hiring, retention, and supervision.[34]

As for Plaintiffs' intentional infliction of emotional distress claim under Georgia law, they claim that "Defendants conduct towards" them "caused . . . severe shame, humiliation, embarrassment, and emotional distress of a nature that no reasonable person can endure." [Doc. 1, ¶ 116]. Their allegations are brimming with legal conclusions and should have long ago been tossed via a motion to dismiss. *See, e.g.*, [Doc. 1, ¶¶ 115–18]. Nevertheless, as a question of law, the Court concludes that

---

[34] *See Holston v. Sports Auth., Inc.*, 136 F. Supp. 2d 1319, *adopted in pertinent part*, 136 F. Supp. 2d 1319 (N.D. Ga. 2000), *aff'd without op.*, 251 F.3d 164 (11th Cir. 2001) (wherein the district court explained that a claim for negligent hiring or retention based upon racial discrimination fails to state a claim under Georgia law, noting that negligence claims can arise only from common law duties, and there is no common law duty to prevent discrimination in employment).

Plaintiffs' failures to receive promotions are not akin to the "sufficiently outrageous and egregious" conduct required for this type of claim under Georgia law. *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1229 (11th Cir. 1993) (noting that Georgia courts have held that an employee's termination—"'however stressful to the employee'—generally is not extreme and outrageous conduct")). If termination is insufficient for a claim for intentional infliction of emotional distress, then a failure to get promoted—while remaining employed—must surely fail.

In addition to their general emotional distress claims, it appears that one portion is pinpointed on what happened during Ingle's second drug test—having to "urinate in the presence of an unknown male." [Doc. 29, p. 16]. The Eleventh Circuit Court of Appeals has recognized that Georgia law does not recognize hurt feelings to establish liability for emotional distress and that to recover for such a claim a plaintiff must present evidence of conduct "so severe that no reasonable person could be expected to endure it." [Doc. 20-1, p. 17 (first quoting *Durley v. APAC, Inc.*, 236 F.3d 651, 658 (11th Cir. 2000) and then quoting *Ellison v. Burger King Corp.*, 670 S.E.2d 469, 473 (Ga. Ct. App. 2008))]. Thus, Ingle's emotional distress claim arising out of the second drug test fails for the simple fact that a witnessed urine sample—if the first one is diluted—*could be expected* of him. [*Id.*]; *see also Adams*, 2013 WL 5441857, at *13. This expectation is clearly outlined in Navicent Health's policies. [Doc. 39-4, Proctor Decl., p. 5]. To base a claim for intentional infliction of emotional distress on this type of drug test is borderline

frivolous, and the Court will not waste taxpayer dollars in further addressing such a silly claim.

Bottom line, neither Collins nor Ingle have viable claims for intentional infliction of emotional distress based on the facts of this case in light of the complete lack of discriminatory employment practices from Defendants. There is no evidence showing that reasonable persons might find that Defendants' employment actions constituted extreme and outrageous conduct. Accordingly, the Court **GRANTS** summary judgment to Defendants on Plaintiffs' claims of intentional infliction of emotional distress.

## <u>CONCLUSION</u>

Looking at the big picture of this case, here's what happened. When Defendants promoted Petit to lieutenant instead of Collins, he claimed it was because of his sex and his age. Then when Richardson became lieutenant, Collins picked another protected characteristic and blamed Defendants' failure to promote on his race. Same thing with Ingle, when Petit received her promotions to sergeant and lieutenant, sex and age discrimination was his go-to. But when Richardson received his promotions to sergeant and lieutenant, Ingle claimed it was because of his race. However, the common denominator between every promotion discussed in this case revolves around Defendants' honest and well-supported belief that Plaintiffs, despite their seniority, were simply less qualified.

"No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers," courts do not interfere unless the employer cannot give an honest, nondiscriminatory explanation for its decisions. *Gogel*, 967 F.3d at 1149. Plaintiffs, even with a record as dense as this one, have not presented evidence that Defendants' legitimate, nondiscriminatory reasons were lies to cover up an elaborate discriminatory plan to keep them from being promoted in the Department. Without such evidence, the Court cannot otherwise look over Defendants' proverbial shoulders and second-guess their employment decisions.

Defendants' Motion for Summary Judgment [Doc. 20] is **GRANTED**.

**SO ORDERED**, this 9th day of November, 2020.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**